*Ex A-C*
*175*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

RIGINAL

SHADY RECORDS, INC.,

       Plaintiff,

v.

       Case No. 04-X-72295-DT
       Hon.: George Caram Steeh
       Magistrate Judge Steven D. Pepe

SOURCE ENTERPRISES, INC.,
DAVID MAYS, RAYMOND SCOTT
p/k/a RAY BENZINO, and BLACK
ENTERPRISE/GREENWICH
STREET CORPORATE GROWTH
MANAGEMENT LLC,

       Defendants,

and

SOURCE ENTERPRISES, INC.,

       Counterclaimant,

v.

SHADY RECORDS, INC.,

       Counterclaim Defendant.

_____/

## NON-PARTY, GREG WIER'S, RESPONSE TO THE SOURCE PARTIES' MOTION TO COMPEL THE DEPOSITION TESTIMONY OF GREGORY WIER

       NOW COMES Non-Party, GREGORY WIER, by and through attorneys, COHEN,

LERNER & RABINOVITZ, P.C., and for his Response to the Source Parties' Motion to

Compel the Deposition Testimony of Gregory Wier, states as follows:

       1.     Gregory Wier's deposition was taken by Defendants' counsel on June 7, 2004.

In further answer, Mr. Wier's attorneys notified the Source parties' counsel of privilege issues

LAW OFFICES OF **COHEN, LERNER & RABINOVITZ P.C.** 200 BEACON CENTRE, 26862 WOODWARD AVENUE • ROYAL OAK, MICHIGAN 48067-0959 • (248) 691-2200 • FAX (248) 691-2214

and Michigan law in that regard well prior to the taking of Mr. Wier's deposition.

    2.    Counsel for Shady Records, Inc. ("Shady") objected to certain questions posed by Defendants' counsel relating to Mr. Wier's employment by Shady, and invoked Shady's private investigator-client privilege pursuant to MCLA § 338.840.

    3.    Gregory Wier neither admits nor denies whether the Defendants' questions were precise, proper and directly probative, and leaves Defendants, Source parties, to their proofs. Furthermore, Mr. Wier states that he is prohibited by Michigan law from divulging any information he acquired during his employment by Plaintiff. MCLA § 338.840. Violation of the statute would subject Mr. Wier to criminal and civil sanctions.

    4.    Mr. Wier did appear voluntarily for the deposition noticed for June 7, 2004. Mr. Wier was unable to answer questions regarding his employment by the Plaintiff. To do so would have subjected Mr. Wier to criminal and civil sanctions pursuant to MCLA § 338.840.

    5.    Non-party, Gregory Wier, files this Response to the Source parties' Motion to Compel his deposition.

WHEREFORE, for the reasons stated above, Non-party, Gregory Wier, prays that this Honorable Court deny the Source Parties' Motion to Compel the Deposition Testimony of Gregory Wier in its entirety, and further, grant such other and further relief as justice and equity may require.

LAW OFFICES OF  COHEN, LERNER & RABINOVITZ P.C.  200 BEACON CENTRE 26862 WOODWARD AVENUE • ROYAL OAK, MICHIGAN 48067-0959 • (248) 691-2200 • FAX (248) 691-2214

Respectfully submitted,

COHEN, LERNER & RABINOVITZ, P.C.
By:     Steven Z. Cohen (P29344)
        Samuel S. Herman (P24238)
Attorneys for Gregory Wier
26862 Woodward Avenue, Suite 200
Royal Oak, MI 48067
(248) 691-2200

Dated:      July 6, 2004

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

SHADY RECORDS, INC.,

        Plaintiff,

v.

SOURCE ENTERPRISES, INC.,
DAVID MAYS, RAYMOND SCOTT
p/k/a RAY BENZINO, and BLACK
ENTERPRISE/GREENWICH
STREET CORPORATE GROWTH
MANAGEMENT LLC,

        Defendants,

and

SOURCE ENTERPRISES, INC.,

        Counterclaimant,

v.

SHADY RECORDS, INC.,

        Counterclaim Defendant.

Case No. 04-X-72295-DT
Hon.: George Caram Steeh
Magistrate Judge Steven D. Pepe

_____/

## NON-PARTY, GREGORY WIER'S, BRIEF IN SUPPORT OF HIS RESPONSE TO THE SOURCE PARTIES' MOTION TO COMPEL THE DEPOSITION TESTIMONY OF GREGORY WIER

LAW OFFICES OF  COHEN, LERNER & RABINOVITZ P.C.  •  200 BEACON CENTRE, 26862 WOODWARD AVENUE • ROYAL OAK, MICHIGAN 48067-2059 • (248) 691-2200 • FAX (248) 691-2214

## TABLE OF CONTENTS

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.      The Private Investigator-Client Privilege is Applicable to the
          Employment Relationship Between Mr. Wier and Shady. . . . . . . . . . . . 3

    II.     The Information Acquired by Mr. Wier During his Employment
          as a Private Investigator is Subject to the Private Investigator-
          Client Privilege. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    III.    The Private Investigator-Client Privilege has Not Been Waived. . . . . . . 8

    IV.    Defendants' Argument that the Information Cannot be Obtained from Another
          Source is Irrelevant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

LAW OFFICES OF **COHEN, LERNER & RABINOVITZ P.C.** 200 BEACON CENTRE 26862 WOODWARD AVENUE • ROYAL OAK, MICHIGAN 48067-0959 • (248) 691-2200 • (248) 691-2200 • FAX (248) 691-2214

i

## TABLE OF AUTHORITIES

### Cases

*Ravary v Reed,* 163 Mich App 447; 415 NW2d 240 (1987) . . . . . . . . . . . . . . . . . . . . .  6

*White v White*, 256 Mich App 39, 46; 662 NW2d 69 (2003) . . . . . . . . . . . . . . . .  7, 8, 9

### Statutes

MCLA § 338.821 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

MCLA § 338.822(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 5

MCLA § 338.840 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2, 3, 5, 6

LAW OFFICES OF   **COHEN, LERNER & RABINOVITZ P.C.**   200 BEACON CENTRE. 26862 WOODWARD AVENUE • ROYAL OAK, MICHIGAN 48067-0959 • (248) 691-2100 • FAX (248) 691-2214

## STATEMENT OF FACTS

Non-party, Gregory Wier, appeared voluntarily for deposition on June 7, 2004. Mr. Wier is a private investigator, licensed through Progressive Security Concepts, LLC. (See Exhibit A, Private Detective Agency License). In a deposition on May 11, 2004, a representative of Shady Records, Inc. ("Shady"), Paul Rosenberg, testified that Shady retained Mr. Wier in the capacity of a private investigator. (See Exhibit B, Deposition of Paul Rosenberg, p. 66). Shady hired Mr. Wier to locate and recover certain lost or stolen property, and to secure evidence to be used before a court. Mr. Wier was also hired by Shady to identify the whereabouts of individuals in possession of specific tape recordings. During his deposition, Paul Rosenberg, on behalf of Shady, asserted the private investigator-client privilege in accordance with Michigan law, specifically, MCLA § 338.840. (See Exhibit B, Deposition of Paul Rosenberg, p. 67).

The same privilege was asserted by Shady, through its counsel, on June 7, 2004 during the deposition of Gregory Wier. Accordingly, Mr. Wier was instructed not to answer questions relating to his employment by Shady in accordance with Michigan law. Had Mr. Wier acted in violation of Michigan law, he would have been found guilty of a misdemeanor, and would be subject to immediate suspension and/or revocation of his license pursuant to MCLA § 338.840(2). Despite Defendants' contention to the contrary, Mr. Wier was, at all times, employed by Shady in the capacity of a private investigator. Even if Plaintiff had not asserted the privilege, Mr. Wier is prevented by statute from divulging to anyone other than his employer any information acquired by him during his employment with respect to any of the work to which he was assigned by the employer. MCLA §338.840. In addition, the statute

2

prevents an investigator from willfully divulging or otherwise disclosing to any other individual other than the respective client any information acquired by him during employment by the client.   MCLA §338.840.   Mr. Wier acted in accordance with Michigan law during his deposition testimony. Since Shady has not waived the private investigator-client privilege and Michigan law penalizes disclosure, Mr. Wier is prohibited from answering questions regarding his employment by Shady.

## ARGUMENT

### I.    The Private Investigator-Client Privilege is Applicable to the Employment Relationship Between Mr. Wier and Shady.

Defendants, Source parties, have not and cannot deny that the private investigator-client privilege is a valid privilege recognized by the laws of the State of Michigan. In addition, the Defendants cannot deny that Mr. Wier is a licensed private investigator in the State of Michigan, and therefore, is subject to the private investigator-client privilege and Michigan law prohibiting disclosure of information obtained during his employment by a client. The Private Detective License Act, MCLA § 338.821 *et seq*, provides the following definition:

> A 'private detective' or 'private investigator' means a person, other than an insurance adjuster who is on salary and employed by an insurance company, who, for a fee, reward, or other consideration, engages in business or accepts employment to furnish, or subcontracts or agrees to make, or makes an investigation for the purpose of obtaining information with reference to any of the following:
>
> (i)    Crimes or wrongs done or threatened against the United States or a state or territory of the United States.
>
> (ii)   The identity, habits, conduct, business, occupation, honesty, integrity, credibility, trustworthiness, efficiency, loyalty, activity, movement, whereabouts, affiliations, associations, transactions,

3

acts, reputation, or character of a person.

(iii)    The location, disposition, or recovery of lost or stolen property.

(iv)    The cause or responsibility for fires, libels, losses, accidents, or damage or injury to persons or property.

(v)    Securing evidence to be used before a court, board, officer, or investigating committee.

MCLA § 338.822 (b).

Gregory Wier was employed by the Plaintiff in accordance with MCLA § 338.822 (b). Mr. Wier was hired to identify the whereabouts of certain tape recordings and recover lost or stolen property. Mr. Wier was hired to do so in order to secure evidence to be used before a court. The following is taken from Paul Rosenberg's deposition:

Q:    Did Shady Records retain Mr. Wier as a private investigator?

THE WITNESS:    Yes.

(See Exhibit B, Deposition of Paul Rosenberg, p. 66).

For these reasons, it is obvious that Mr. Wier's employment by Shady Records falls within the purview of the private investigator definition above. Although Defendants state over and over that Mr. Wier was not acting in his capacity as private investigator, they fail to provide any admissible evidence whatsoever as to why his employment does not fall within the statute. Simply, Defendants state that Mr. Wier was a "straw man for Shady." This allegation is certainly not sufficient evidence to refute the fact that Mr. Wier was acting in the capacity of a private investigator at all relevant times during his employment by Shady. As such, Mr. Wier is subject to the Private Detective Licence Act.

4

Defendants wrongfully assert that Mr. Wier cannot claim the private investigator-client privilege because the privilege does not belong to Mr. Wier, but rather to Shady, Mr. Wier's client. As noted in the Statement of Facts above, Mr. Rosenberg, shareholder and representative of Shady, asserted the private investigator-client privilege at his deposition. In addition, Shady's attorney asserted the privilege on its behalf at the deposition of Gregory Wier.

Even had Shady not asserted the private investigator-client privilege during the two depositions, Mr. Wier would be unable to disclose or divulge any information he acquired during employment by Shady. The statute is clear that Mr. Wier cannot disclose or divulge such information, except as he may be required by law, to any other individual other than the client, which is Shady in this case. MCLA § 338.840. The statute acts as a strict prohibition.

## II.     The Information Acquired by Mr. Wier During his Employment as a Private Investigator is Subject to the Private Investigator-Client Privilege.

Once again, Mr. Wier was hired by Shady to conduct an investigation as defined in MCLA § 338.822(b). Mr. Wier is unable to divulge information obtained during his employment by Shady pursuant to Michigan law, specifically, MCLA § 338.840, which states:

> (1) Any person who is or has been an employee of a licensee shall not divulge to anyone other than his employer or former employer, or as the employer shall direct, except as he may be required by law, any information acquired by him during his employment in respect to any of the work to which he shall have been assigned by the employer. Any employee violating the provisions of this section and any employee who willfully makes a false report to his employer in respect to any work is guilty of a misdemeanor.
>
> (2) Any principal, manager or employee of a licensee who wilfully

5

> furnishes false information to clients, or who wilfully sells, divulges or otherwise discloses to other than clients, except as he may be required by law, any information acquired by him or them during employment by the client is guilty of a misdemeanor, and shall be subjected to immediate suspension of license by the secretary of state and revocation of license upon satisfactory proof of the offense to the secretary of state. Any communications, oral or written, furnished by a professional man or client to a licensee, or any information secured in connection with an assignment for a client, shall be deemed privileged with the same authority and dignity as are other privileged communications recognized by the courts of this state.

As the statute clearly states, even had Shady Records not asserted the private investigator-client privilege, Mr. Wier could not divulge or otherwise disclose to anyone other than his client any information acquired by him during his employment by the client. To do so would make him guilty of a misdemeanor, and subject him to the immediate suspension and revocation of his license. Certainly, when a client does assert the privilege, Mr. Wier cannot then act in violation of that privilege and subject himself to civil and criminal sanctions. Without direction from Shady to disclose the information or a legal requirement to do so, Mr. Wier is unable to answer deposition questions regarding his employment by Shady.

In *Ravary v Reed*, 163 Mich App 447, 451-52; 415 NW2d 240 (1987), the Court was faced with analyzing the same Michigan statute at issue in the case at bar. The Michigan Court of Appeals stated the following in reference to MCLA § 338.840:

> The statute reflects the Legislature's determination that broad protection is to be accorded the private detective-client relationship. Any communication by a client to a licensee and any information secured in connection with an assignment for a client is privileged. The Legislature's express extension to those communications of the authority and dignity conferred upon other, judicially recognized privileged communications prompts us to construe the scope of this privilege by analogy to the attorney-client privilege.

6

The court further indicated that:

> The Michigan statute not only penalizes breaches of confidence but clearly establishes a testimonial privilege. The statute represents a declaration by the Legislature that the conditions necessary to the establishment of a privilege are present in the private detective-client relationship. This Court is bound to enforce the policy set forth by the Legislature.

*Id.* at 452.

In the recent case of *White* v *White*, 256 Mich App 39, 46; 662 NW2d 69 (2003), the

Court was again called to examine the private investigator-client privilege statute. The

Michigan Court of Appeals held that the private investigator-client privilege statutes are

"unambiguous and should be enforced as written." The Court explained that the statutory

private investigator-client privilege protects both communications from the client to the

licensee and information secured in connection with an assignment for a client. *Id.* The Court

rejected the prosecutor's arguments that the statutory language should be read narrowly and

argued that:

> Clearly, MCL 338.840(1) and MCL 338.840(2) penalize the unauthorized disclosure of *any* information 'acquired' by the investigator 'during his employment' regarding 'any of the work to which he shall have been assigned....' Accordingly, the investigator is forbidden from disclosing information to anyone but his employer, except as his employer may direct or as authorized by law. In our view, this provision would forbid the investigator from disclosing communications, facts, evidence, or other types of information that the investigator obtained during the course of his employment, even if he did not develop that information himself, but merely learned of it by overhearing discussions or reviewing documents.
> ...
> In contrast to the penalty provision of the initial sentence of MCL 338.840(2), we read the second sentence to establish a legal prohibition that allows a client to prevent disclosure.

7

LAW OFFICES OF  COHEN, LERNER & RABINOVITZ, P.C.   200 BEACON CENTRE, 26862 WOODWARD AVENUE • ROYAL OAK, MICHIGAN 48067-0959 • (248) 691-2200 • FAX (248) 691-2214

*Id.* at 47.

In addition, the Court did not find persuasive the prosecutor's argument that disclosure of the information was needed to advance a homicide investigation. *Id.* Instead, the Court stated that "[t]here is no statutory exception that permits the trial court to set aside the privilege on the prosecutor's showing of need." *Id.* at 52. The statute creates an "assumption that any forced disclosure of the information protected will cause injury to the privilege holder," who is Shady in the case at bar. *Id.* at 46. *(citations omitted).* The Court's ruling pertaining the private investigator-client privilege in *White* is unquestionably the same ruling that should be made in this case. The Court concluded as follows:

> The plain language of the statutory privilege, MCL 338.840(2), precluded the trial court from ordering respondent's private investigator to turn over information obtained during the course of his investigation and in accordance with the assignment for which he was retained.

*Id.* at 52.

## III.     The Private Investigator-Client Privilege has Not Been Waived.

Since it is Shady not Mr. Wier that holds the privilege, as in the attorney-client privilege, Mr. Wier has not, and, in fact, cannot waive the private investigator-client privilege for Shady. Furthermore, as evidenced in the deposition of Mr. Wier, the parties had an agreement that questions answered during the depositions would not constitute a waiver of the privilege as to any other questions. The following is taken from Mr. Wier's deposition:

> MR. DAVID: So he can answer. Do we have an agreement if we let him answer some of these questions that he won 't waive the privilege on the other ones?

8

MR. LANE: With respect to every deposition we've done. We've had it.

(See Exhibit C, Deposition of Gregory Wier, p. 31).

## IV. Defendants' Argument that the Information Cannot be Obtained from Another Source is Irrelevant.

Defendants' ability or inability to get the information related to Mr. Wier's investigation for Shady is irrelevant to the Court's analysis regarding the private investigator-client privilege. As the Court stated in *White, supra,* there is no statutory exception permitting a court to set aside the privilege on the basis of a party's need. 256 Mich App 52. Furthermore, whether or not the information is available through other means is a legal conclusion. The statute specifically prohibits a fishing expedition by the Defendants.

## CONCLUSION

WHEREFORE, for the reasons stated above, Non-party, Gregory Wier, prays that this Honorable Court deny the Source Parties' Motion to Compel the Deposition Testimony of Gregory Wier in its entirety, and further, grant such other and further relief as justice and equity may require.

Respectfully submitted,

COHEN, LERNER & RABINOVITZ, P.C.
By: Steven Z. Cohen (P29344)
Samuel S. Herman (P24238)
Attorneys for Gregory Wier
26862 Woodward Avenue, Suite 200
Royal Oak, MI 48067
(248) 691-2200

Dated: July 6, 2004

9

**PROOF OF SERVICE**

The undersigned declares that a copy of this instrument was served on the attorneys of record for all parties to the within cause by mailing same to said attorneys at each address as indicated by the pleadings on file with this Court with postage fully prepaid thereon _____ day of _____. The statement above is true to the best of my information and belief.



L434379

STATE OF MICHIGAN
DEPARTMENT OF CONSUMER & INDUSTRY SERVICES

PRIVATE DETECTIVE REGULATION

PRIVATE DETECTIVE AGENCY LICENSE

Willette, John C.
Progressive Security Concept, LLC
16250 Northland Dr
Suite 370
Southfield  MI  48075

| PERMANENT I.D. NO. | EXPIRATION DATE | | |
|---|---|---|---|
| 3701204802 | 05/31/2007 | 1239431 | THIS DOCUMENT IS DULY ISSUED UNDER THE LAWS OF THE STATE OF MICHIGAN. |

L434377

STATE OF MICHIGAN
DEPARTMENT OF CONSUMER & INDUSTRY SERVICES

SECURITY GUARD REGULATION

SECURITY GUARD AGENCY LICENSE

Willette, John C.
Progressive Security Concept, LLC
16250 Northland Dr
Suite 370
Southfield  MI  48075

| PERMANENT I.D. NO. | EXPIRATION DATE | | |
|---|---|---|---|
| 3801204801 | 05/31/2006 | 1239511 | THIS DOCUMENT IS DULY ISSUED UNDER THE LAWS OF THE STATE OF MICHIGAN. |



1

1    IN THE DISTRICT COURT OF THE UNITED STATES

2         FOR THE SOUTHERN DISTRICT OF NEW YORK

3                                    Scanned *5/18/18*

4    SHADY RECORDS, INC.,

5              Plaintiff,

6         vs.                    Case No. 03-CV 9944

7

8    SOURCE ENTERPRISES, INC.,        FILE NO. *12535/1*

9    DAVID MAYS, RAYMOND SCOTT,       CLIENT *Shady / Source*

10   p/k/a RAY BENZINO, and BLACK     SUB-FILE *Cit Bench*

11   ENTERPRISE/GREENWICH STREET      SUB-SUB-FOLDER _____

12   CORPORATE GROWTH MANAGEMENT, LLC,

13              Defendants.

14   _____

15

16      H I G H L Y   C O N F I D E N T I A L

17

18      The Videotaped Deposition of PAUL ROSENBERG,

19      Taken at 1760 South Telegraph Road, Suite 300,

20      Bloomfield Hills, Michigan,

21      Commencing at 10:11 a.m.,

22      Tuesday, May 11, 2004,

23      Before Judith C. Werner, CSR-2349.

24

25           CONFIDENTIAL

2

```
1   APPEARANCES:
2
3   DONALD N. DAVID
4   Fischbein Badillo Wagner Harding
5   909 Third Avenue
6   New York, New York 10022
7   (212) 453-3750
8       Appearing on behalf of the Plaintiff.
9
10  MICHAEL S. ELKIN
11  Thelen Reid & Priest
12  875 Third Avenue
13  New York, New York 10022-6225
14  (212) 603-6510
15      Appearing on behalf of the Defendants Source
16      Enterprises, David Mays and Raymond Scott.
17
18  ALSO PRESENT:
19  Tracy Clegg - Video Technician
20
21
22
23
24
25
```

3

```
1   Bloomfield Hills, Michigan
2   Tuesday, May 11, 2004
3   10:11 a.m.
4
5       VIDEO TECHNICIAN: We are now on the record.
6   This is the videotaped deposition of Paul Rosenberg
7   being taken on May the 11th, 2004. The time is now
8   10:11 and 57 seconds a.m. We are located at 1760
9   South Telegraph Road, Suite 200, in Bloomfield Hills,
10  Michigan. This deposition is being taken on behalf of
11  the defendant in the matter of Shady Records,
12  Incorporated versus David Mays, Raymond Scott,
13  professionally known as Ray Benzino, and Black
14  Enterprise/Greenwich Street Corporate Growth
15  Management, LLC, and Source Enterprises, Incorporated
16  versus Shady Records, Incorporated and Marshall Bruce
17  Mathers, the Third, professionally known as Eminem.
18  This is case number 03-CV 9944 GEL. This matter is
19  being held before the Honorable Gerald Lynch in the
20  United States District Court, Southern District of New
21  York.
22      My name is Tracy Clegg, videotape operator.
23  Will the court reporter swear the witness in and the
24  attorneys briefly identify themselves for the record,
25  please.
```

4

```
1               PAUL ROSENBERG,
2   was thereupon called as a witness herein, and after
3   having first been duly sworn to testify to the truth,
4   the whole truth and nothing but the truth, was
5   examined and testified as follows:
6       MR. DAVID: Donald David from Fischbein
7   Badillo Wagner Harding for the plaintiff.
8       MR. ELKIN: Michael Elkin, Thelen Reid &
9   Priest, representing the defendant and counterclaimant
10  Source Enterprises, Inc.
11      Good morning, Mr. Rosenberg.
12      THE WITNESS: Morning.
13      MR. DAVID: Michael, you're not
14  representing the individual defendants?
15      MR. ELKIN: The other individual -- we are
16  representing the other individual defendants as well,
17  but they also are represented primarily by the
18  McMillan firm.
19      MR. DAVID: Okay.
20          EXAMINATION
21  BY MR. ELKIN:
22  Q. Mr. Rosenberg, what do you do for a living, sir?
23  A. I am an attorney, artist manager, and I own a record
24     company.
25  Q. And would that record company be Shady Records, Inc.?
```

5

```
1   A. Yes.
2   Q. And what percentage of that company do you own, sir,
3      by way of shares?
4   A. Forty percent.
5   Q. And do you know approximately when that company was
6      incorporated?
7   A. 1999.
8   Q. And who, if you know, are the other shareholder or
9      shareholders of that company?
10  A. The only other shareholder is Marshall Mathers.
11  Q. Do you also act as the manager for Mr. Mathers'
12     professional career?
13  A. Personal manager, yes.
14  Q. Do you and he have a management contract, written
15     management contract?
16  A. We do not have a current management contract. It's on
17     a handshake right now.
18  Q. Was there a point in time where you and he had a
19     written management contract?
20  A. Yes.
21  Q. And when did that expire?
22  A. I'm not exactly sure. It was sometime in -- early
23     this decade. I'm not exactly sure.
24  Q. From 2000 on, somewhere between 2000 and 2004?
25  A. Correct.
```

6

1   Q.  Okay. And is there a shareholder agreement between
2       you and Mr. Mathers in respect of your interests
3       concerning Shady Records, Inc.?
4   A.  There is.
5   Q.  What does Shady Records, Inc. do by way of activities,
6       if you could describe that?
7   A.  Well, we sign and develop recording artists.
8   Q.  And one of the recording artists is Eminem. Is that
9       correct?
10   A.  No.
11   Q.  Who are the current artists on the roster of Shady
12       Records?
13   A.  D12, Obie Trice, Green Lantern, Stat Quo, 50 Cent.
14   Q.  Does Shady Records, Inc. own to your knowledge any
15       copyright interests?
16   A.  Yes.
17   Q.  With respect to the copyright interests that they own,
18       does some of the copyright interest comprise what's
19       known as master recording copyrights?
20   A.  Yes.
21   Q.  And does Shady Records, Inc. also own what's known as
22       music composition copyrights?
23   A.  Not exactly for the most part, no.
24   Q.  Is there a separate company that -- withdrawn. Is
25       there any affiliate to your knowledge of Shady that

7

1       owns music composition copyright interests?
2   A.  Describe affiliate.
3   Q.  Any company that either you, Mr. Mathers and/or Shady
4       Records owns a majority interest in.
5   A.  No.
6   Q.  Does Shady Records, Inc. own any record master
7       copyrights in respect of any recordings of Marshall
8       Mathers?
9   A.  Including the subject of this case?
10   Q.  Correct.
11   A.  Yes.
12   Q.  Other than -- setting aside for the moment Oh Foolish
13       Pride and So Many Styles which we'll come back to, are
14       there any other sound recording copyrights that Shady
15       owns in which Mr. Mathers is a recording artist?
16   A.  Well, we don't own them outright, no.
17   Q.  You own a percentage of the copyright interest?
18   A.  Yes, which -- yes.
19   Q.  What percentage, if there is a standard percentage?
20   A.  Of which recordings?
21   Q.  Of any recordings in which Mr. Mathers is a recording
22       artist.
23           MR. DAVID: Other than the ones that are
24       the subject of this action.
25           MR. ELKIN: Correct.

8

1           THE WITNESS: Typically Mr. Mathers'
2       masters are owned by Aftermath Entertainment and
3       Interscope. However, there are some masters which he
4       recorded that Shady owns with Interscope that include
5       his performances as well.
6   BY MR. ELKIN:
7   Q.  And with respect to songs that Mr. Mathers writes or
8       co-writes, do you know what company owns those music
9       composition copyrights? Withdrawn.
10           Do you know who owns Mr. Mathers' music
11       composition copyrights that were created from the time
12       that you began to manage his career?
13   A.  Do I know who, yes.
14   Q.  Who is that?
15   A.  He owns most of his copyrights.
16   Q.  And does he own it in his individual capacity?
17   A.  No.
18   Q.  Does he own it through a corporation?
19   A.  There's a separate corporation that has partial
20       ownership in his copyrights.
21   Q.  And what's the name of that corporation?
22   A.  8 Mile Style.
23   Q.  8 Mile --
24   A.  -- Style.
25   Q.  -- Style. Okay. And that's a New York corporation?

9

1   A.  No.
2   Q.  Michigan?
3   A.  It's an LLC I believe, and I'm not sure if it's
4       Michigan but I believe so.
5   Q.  Is he the sole member of that LLC, if you know?
6   A.  He doesn't own any of it.
7   Q.  Who owns it?
8   A.  FBT Productions.
9   Q.  And who is FBD Productions?
10   A.  FBT.
11   Q.  FBT Productions.
12   A.  Mark Bass and Jeff Bass.
13   Q.  So those are the members of that LLC that own the
14       interest in the LLC.
15   A.  I believe so.
16   Q.  So to your knowledge does Mr. Mathers own any music
17       composition copyrights from and after the time you
18       began to manage his career?
19   A.  I already answered that. Yes, he does. He owns a
20       portion of them.
21   Q.  And do you know what percentage portion he owns of
22       them?
23   A.  Well, of the musical compositioning side?
24   Q.  Correct.
25   A.  Of the portion that he controls?

10

1  Q.  Yes.
2  A.  On any given song?
3  Q.  Yes.
4  A.  Seventy-five percent.  To be clear, that's from the
5      time I was managing him.
6  Q.  Yes, I understood that.  How do you get compensated in
7      respect of the services that you provide to Mr.
8      Mathers?
9  A.  Are you talking just management or --
10 Q.  Well, start with management.
11 A.  I receive a percentage based on his earnings.
12 Q.  What percentage is that?
13 A.  Seventeen and a half.
14 Q.  And you also receive -- you have an equity interest in
15     Shady Records, Inc.
16 A.  Correct.
17 Q.  Are there any other ways in which you're compensated
18     other than through your equity interest in Shady
19     Records and through the percentage of commission in
20     respect of revenues that he makes from his career?
21 A.  From his career?
22 Q.  Yes.
23 A.  Yes.
24 Q.  And what other ways is that?
25 A.  We have several other businesses and things we do

11

1      together.
2  Q.  Could you just describe briefly what they are?
3  A.  Well, merchandising.  We did -- we have a production
4      company together.  We have a licensing company
5      together.  There's a clothing company.  That's pretty
6      much it at this time.
7  Q.  And just to sort of cut to the chase, would it be fair
8      to say that your compensation in respect of these
9      various companies or revenues to you vary from
10     transaction to transaction, or is there a straight
11     percentage?
12 A.  I would say, I would say that it varies.
13 Q.  You're familiar with a company by the name of
14     Interscope Records, correct?
15 A.  Yeah.
16 Q.  And you're familiar with a record label I gather owned
17     at least in part by them, Aftermath?
18 A.  Yes.
19 Q.  Aftermath is a company that's owned by Interscope and
20     the artist known as Dr. Dre or who was once known as
21     Dr. Dre?
22 A.  I don't know if there's any other owners of Aftermath,
23     but I do know that Dre is an owner and Interscope is
24     an owner.
25 Q.  Does Interscope own any interest in Shady?

12

1  A.  Interscope only owns an interest in Shady to the
2      extent that we have a venture together.
3  Q.  So there's a joint venture between Shady and
4      Interscope?
5  A.  Correct.
6  Q.  But Interscope does not own any shares in stock
7      ownership of Shady.  Is that correct?
8  A.  Correct.
9  Q.  And could you describe briefly your understanding as
10     to the joint venture between Shady and Interscope?
11 A.  In what regards?
12 Q.  What is the nature of the venture?  Are you recording
13     music together?  Are you publishing music together?
14     Are you embarking on developing and recording new
15     artists?
16 A.  We sign, develop and deliver artists' albums to
17     Interscope for their sale and distribution.
18 Q.  Would one of the artists include Mr. Mathers?
19 A.  No.
20 Q.  So there is no joint venture between Shady and
21     Interscope in respect of the services of Mr. Mathers.
22     Is that correct?
23 A.  That's correct.
24 Q.  I gather there is some legal document between
25     Interscope and Shady under which this venture is owned

13

1      and operated?
2  A.  Of course.
3  Q.  Now is there any interest that -- withdrawn.  Do you
4      know what Aftermath does?
5  A.  Yes.
6  Q.  What do they do?
7  A.  Aftermath Entertainment is in the same business as we
8      are, Shady Records.
9  Q.  Does Aftermath have any ownership interest in Shady?
10 A.  No.
11 Q.  And is there any business transaction that is
12     currently in operation between Aftermath and Shady?
13 A.  Not directly.
14 Q.  Is there any indirect business activity between
15     Aftermath and Shady to your knowledge?
16 A.  We have a venture on an artist together.
17 Q.  And who is that artist?
18 A.  50 Cent.
19 Q.  Apart from the 50 Cent artist transaction, are there
20     any other current business activities between
21     Aftermath and Shady to your knowledge?
22 A.  Yes.
23 Q.  Would you describe what they are briefly?
24 A.  It would be through Mr. Mathers' producing services as
25     he would produce various things for artists on

14

1      Aftermath/Interscope.

2  Q.  So briefly stated, Aftermath sometimes retains him as

3      a producer in respect of certain recordings?

4  A.  Correct, but the reason that I say it's with Shady is

5      because it's via terms within a deal between

6      Interscope and Shady for his services.

7  Q.  As a producer.

8  A.  Correct.

9  Q.  Are you familiar with a gentleman by the name of Rand,

10     R-a-n-d, Hoffman, H-o-f-f-m-a-n?

11  A.  Yes, I am.

12  Q.  Who is Mr. Hoffman?

13  A.  Mr. Hoffman is an attorney who is the -- they don't

14     have official titles but is known as the head of legal

15     affairs at Interscope Records.

16  Q.  Has -- does Mr. Rand own any --

17          MR. DAVID: Mr. Hoffman.

18          MR. ELKIN: I'm sorry. Thank you. You're

19     correct.

20  BY MR. ELKIN:

21  Q.  Does Mr. Hoffman own any interest in -- has Mr.

22     Hoffman ever owned any interest in Shady?

23  A.  No.

24  Q.  Has he ever been elected as a director in Shady?

25  A.  No.

15

1  Q.  Has he ever been appointed as an officer by the

2     directors of Shady?

3  A.  No.

4  Q.  Has he ever acted as counsel for Shady?

5          MR. DAVID: What do you mean by acting as

6     counsel?

7  BY MR. ELKIN:

8  Q.  Have you -- has Shady ever retained the services of

9     Mr. Hoffman to represent Shady in connection with any

10     business activities?

11  A.  Well, he does act as counsel for venture activity

12     between Shady and Interscope.

13  Q.  In the context of the activities between those

14     companies.

15  A.  Yes, and between those companies and other companies.

16  Q.  What is the, what is the name of the venture, by the

17     way, between Shady and Interscope?

18  A.  It's just Shady slash Interscope.

19  Q.  There's no official name.

20  A.  No.

21  Q.  And there's no document that -- withdrawn. There's no

22     agreement under which Shady Records, Inc. is a party

23     where Mr. Hoffman is a party in respect of any

24     services that he would perform with respect to Shady.

25     Is that correct?

16

1          MR. DAVID: Object to the form, but you may

2     answer.

3          THE WITNESS: I think his contract with

4     Interscope would require him to act as counsel for the

5     venture partners. We don't have an agreement directly

6     with him.

7  BY MR. ELKIN:

8  Q.  And Shady has never retained Mr. Hoffman in respect of

9     any activities solely with respect to Shady Records'

10     activities. Is that correct?

11          MR. DAVID: Asked and answered. You can

12     answer again.

13          THE WITNESS: Outside of the venture?

14  BY MR. ELKIN:

15  Q.  I'm just speaking specifically with respect to Shady

16     Records itself, not with respect to joint venture

17     activities. In respect of Shady Records' activities,

18     has Shady Records, Inc. ever retained the services of

19     Mr. Hoffman?

20          MR. DAVID: Object to the form. You may

21     answer.

22          THE WITNESS: No.

23  BY MR. ELKIN:

24  Q.  Now, with respect to Shady Records' copyright

25     interests -- and as I understand them, the copyright

17

1     interests are mostly in sound recording copyrights.

2  A.  Uh-huh.

3          MR. DAVID: She can't record a --

4          THE WITNESS: Yes.

5          MR. DAVID: You need to verbalize.

6  BY MR. ELKIN:

7  Q.  These are a couple of just general background

8     questions, if I could. Are there certain -- you act

9     as -- among other hats that you wear within the

10     company, you also act as counsel to Shady Records,

11     Inc.? Is that correct? Is that fair to say?

12  A.  Yeah.

13  Q.  And who are the other lawyers that over the last few

14     years also regularly represent Shady in connection

15     with its business dealings?

16  A.  Theo Sedlmayr, Gary Stiffelman. Those are the two

17     primary attorneys outside of myself that represent

18     Shady with respect to anything outside of the venture

19     and within the venture.

20  Q.  And what about Mr. Hertz, Howard Hertz?

21  A.  Yeah. Well, he does too actually. He's not one of

22     the primaries but he helps with things, yes.

23  Q.  And among -- would it be fair to say that part of your

24     responsibilities as counsel to Shady Records, you

25     participate in the actual documentation of acquisition

18

1  of sound recording copyright interests?
2  A. You need to be more specific.
3  Q. Okay. Do you draft any documents in respect of Shady
4     acquiring copyright interests in sound recordings?
5  A. Documents or agreements?
6  Q. Well, let's start with agreements. That's a fair
7     point.
8  A. No, I don't draft agreements.
9  Q. Do you instruct -- without getting involved in any
10    specific legal advice, do you instruct counsel in
11    respect of drafting legal documentation?
12 A. Yes.
13 Q. And do you review that documentation as part of your
14    regular duties?
15 A. Yes.
16 Q. And are you familiar generally with the legal
17    documentation as it relates to the acquisition of
18    sound recording copyrights for Shady?
19 A. Yes.
20 Q. And to your knowledge is it the usual custom and
21    practice of Shady to acquire its sound recording
22    copyright interests through documentation known as a
23    work for hire agreement?
24       MR. DAVID: Wait one second.
25       Answer that yes or no if you can.

19

1        THE WITNESS: Repeat the question.
2        MR. ELKIN: Sure. Judy, would you mind
3  repeating it?
4        (The requested portion of the record was
5        read by the reporter at 10:35 a.m.)
6        THE WITNESS: It's difficult to answer that
7  question yes or no. I can explain why.
8        MR. DAVID: To the extent to which you're
9  going to explain why, I'm going to assert
10 attorney-client privilege. If you can answer yes or
11 no, I was willing to let you answer it.
12       THE WITNESS: I can't answer yes or no.
13       MR. DAVID: But if it's going to require
14 your explaining what you do and advice you give
15 internally, I'm not going to let you do that.
16       THE WITNESS: It's more of a general
17 business practice.
18       MR. DAVID: If it's a general business --
19 let me hear what he has to say, if you don't mind,
20 because you may be able to get an answer.
21       THE WITNESS: I was just gonna say that
22 typically --
23       MR. DAVID: The problem is -- take off your
24 mike.
25       MR. ELKIN: Let's go off the record.

20

1        VIDEO TECHNICIAN: Going off the record,
2  the time is 10:33 and 48 seconds a.m.
3        (Discussion off the record at 10:33 a.m.)
4        (Back on the record at 10:34 a.m.)
5        VIDEO TECHNICIAN: We are back on the
6  record at 10:34 and 35 seconds a.m.
7        MR. DAVID: The witness has advised me in
8  such a fashion that I believe he can answer your
9  question without intruding upon the attorney-client
10 privilege, and therefore I will permit him to do so.
11       MR. ELKIN: Thank you.
12       THE WITNESS: I was gonna explain that
13 sound recordings typically for Shady Records are only
14 filed within the venture, and pursuant to the
15 agreement between Shady and Interscope, Interscope
16 slash Universal have the right to file sound
17 recordings for Shady/Interscope's venture. We
18 typically don't do it ourselves.
19 BY MR. ELKIN:
20 Q. Okay. And so with respect to -- so I understand this,
21 so Shady Records itself never directly handles the
22 documentation in respect of the acquisition of
23 copyright interest. All of that's done by Interscope?
24       MR. DAVID: Are you saying other than the
25 recordings involved in the instant case?

21

1        MR. ELKIN: I'm asking a general question.
2        MR. DAVID: The word "never" -- it's not a
3  general question because you said never, but go ahead.
4  Answer the question as he's asked it.
5        THE WITNESS: Not never, no.
6  BY MR. ELKIN:
7  Q. Okay. Well, let's break it down now. Aside from the
8  two purported copyright interests in this particular
9  case, is it the usual custom and practice for Shady
10 Records not to undertake the work associated with --
11 withdrawn.
12       Aside from the two alleged copyright
13 interests in this case, is it the practice of Shady
14 Records to have Interscope handle all the legal
15 documentation in respect of the acquisition of
16 copyright interests?
17 A. Filing or acquisition?
18 Q. Starting with acquisition. I haven't even mentioned
19 anything about filing. I'm going to get to that.
20 A. Acquisition. Well, no, because when we sign artists,
21 we draft our own paperwork.
22 Q. Okay. That's my point. I really want to focus on
23 that. I'll get to filing, I promise.
24       With regard to legal documentation -- and
25 these are general questions. If you can't answer them

22

1    generally, just tell me and I'll figure out another
2    way to break it down. You are familiar with the
3    general kind of documentation, whether it's a work for
4    hire or an assignment or some other way in which sound
5    recording copyrights are conveyed or acquired by Shady
6    Records. Is that fair to say?
7    A. Yes.
8    Q. What are the various ways in which Shady Records has
9    acquired sound recording copyright interest over the
10   years?
11   A. With respect to –
12   Q. Any sound recordings that it owns.
13   A. Any sound recording?
14   Q. Yes.
15   A. Typical ways meaning legal terms?
16   Q. Yes.
17   A. Well, they're typically work for hire but not all; I
18   mean not always, as in the case of this lawsuit.
19   Q. Sometimes they're through assignments, correct?
20   A. Yeah.
21   Q. And generally your outside counsel handles that based
22   on your instructions. Is that the general way it
23   works?
24   A. Yes.
25   Q. And aside from this particular case, which we'll get

23

1    to, are there – do you ever use the intervention of
2    any private investigators in order to obtain any
3    copyright interest?
4        MR. DAVID: Wait one moment.
5        MR. ELKIN: That's a bad question. Let me
6    rephrase.
7    BY MR. ELKIN:
8    Q. Do you ever use the intervention of any private
9    investigators to acquire sound recording copyright
10   interests, separate and apart from the copyright
11   interests that are alleged in this particular case?
12       MR. DAVID: Wait one moment.
13       There is a privilege for investigators in
14   this state, and therefore to the extent to which it
15   involves the retention of investigators in the state
16   of Michigan, I direct you not to include any reference
17   to such investigators. Other than that, for example,
18   in New York where there is no such privilege, you may
19   make such – you may answer.
20       THE WITNESS: Okay. Can you repeat the
21   question?
22   BY MR. ELKIN:
23   Q. Let me just – I'm actually asking a more general
24   question. Then I'll break it down perhaps to the
25   point where Mr. David's comment has more direct

24

1    applicability.
2        Do you generally use third-party
3    intermediaries to acquire sound recording copyright
4    interests, separate and apart from this case which I
5    will get to?
6    A. Third-party intermediaries aside from attorneys?
7    Q. Aside from attorneys, yes.
8    A. And other artists' managers and people within the
9    record business typically?
10   Q. Correct.
11   A. No.
12   Q. With respect to – now the filing of copyright
13   registrations, you're familiar with copyright
14   registrations, are you not?
15   A. Yeah.
16   Q. Are there any copyright registrations in respect of
17   Shady's business, whether it's for its own account or
18   in connection with the joint venture, that Shady
19   undertakes for itself? In other words – and I'm
20   going to repeat the question since it's impossible to
21   follow – does Shady always rely on Universal or its
22   affiliates to undertake all copyright registrations in
23   respect of any sound recording or music composition
24   copyright interest?
25       MR. DAVID: Are you saying other than as to

25

1    these two recordings?
2        MR. ELKIN: I'm including everything for
3    the moment.
4        MR. DAVID: Well, you've got the word
5    "always" in there. That's why.
6        THE WITNESS: Always, no.
7    BY MR. ELKIN:
8    Q. What percentage of the time – withdrawn. What
9    percentage of filings would you estimate are actually
10   done by Shady Records itself? When I say Shady
11   Records itself, it could be Shady Records or its
12   counsel.
13   A. I can't estimate a percentage.
14   Q. Would it be more than 50 percent?
15   A. More than 50 percent by us?
16   Q. Yes.
17   A. And our counsel?
18   Q. Yes.
19   A. No.
20   Q. More than 25 percent?
21   A. No.
22   Q. Would it be more than 15 percent?
23   A. No.
24   Q. More than ten percent?
25   A. Probably not.

26

1  Q.  Okay. So you're saying less than ten percent of all
2      copyright registration filings that are done in
3      respect of record master and music composition
4      copyright filings are done by Shady, and the
5      overwhelming balance is done by Universal or its
6      affiliates? Is that correct?
7  A.  To this point?
8  Q.  Yes.
9  A.  Yes.
10 Q.  Can you recall off the top of your head any copyright
11     registration filings that Shady has done itself?
12 A.  Yes.
13 Q.  And how many can you recall?
14 A.  Well, not necessarily itself but within conjunction
15     with Universal outside of the venture.
16 Q.  Yes.
17 A.  The two compositions that are subject of this case.
18 Q.  That's Oh Foolish Pride and So Many Styles.
19 A.  Yes.
20 Q.  Those were ones that you did yourself.
21 A.  No, I did not do it myself.
22 Q.  Not yourself. When I say yourself, Shady Records,
23     Inc.
24 A.  No, we didn't do them ourselves. We did them with
25     Universal but for Shady's sole ownership.

28

1  A.  With exception of what we're talking about today?
2  Q.  Yes.
3  A.  Yes, but not only on behalf of Shady.
4  Q.  On behalf of who else?
5  A.  Well, when you're talking about his recordings, you're
6      talking about the majority of them being handled by
7      Aftermath and Interscope.
8  Q.  Right, but those are actually sound recording
9      copyrights in which Interscope or Aftermath is
10     actually listed as the copyright claimant, correct?
11 A.  I believe so. I'm not sure. I don't know what their
12     agreement is.
13 Q.  But it's -- anyway, Mr. Mathers is not listed as a
14     copyright claimant in respect of the vast majority of
15     the sound recordings in which he participates.
16         MR. DAVID:  Asked and answered previously.
17     You can answer again.
18         THE WITNESS:  That's correct.
19 BY MR. ELKIN:
20 Q.  And with respect to the music composition copyrights,
21     those are handled and owned by percentage by the Bass
22     brothers and Mr. Mathers, correct?
23 A.  That's correct.
24 Q.  Did there come a point in time, Mr. Rosenberg, where
25     you learned about the so-called Bassmint Productions

27

1  Q.  Right. What I'm asking, are there any copyright
2      registration filings that -- in which Shady is listed
3      as a copyright claimant that Shady has handled the
4      arranging on its own? When I say Shady, it could be
5      either you or its counsel.
6  A.  Completely independent of any --
7  Q.  -- intervention by Universal.
8  A.  -- intervention?
9         MR. DAVID:  I don't know what intervention
10     means.
11        THE WITNESS:  I don't either.
12 BY MR. ELKIN:
13 Q.  Okay. So let me rephrase it. Can you recall off the
14     top of your head any instances in which Shady or its
15     counsel acting on Shady's behalf has handled any
16     filings with the copyright office in respect of which
17     Shady was listed as the copyright claimant?
18 A.  Completely independent of Universal.
19 Q.  Correct.
20 A.  No.
21 Q.  And with respect to the music composition of music
22     composition -- withdrawn. With respect to Mr.
23     Mathers' sound recording copyright interests, those
24     are not owned by Mr. Mathers. Those would be handled
25     by Interscope, correct? Is that your understanding?

29

1      recordings?
2  A.  Which ones?
3  Q.  Well, yesterday -- you were at the deposition
4      yesterday of Mr. Mathers.
5  A.  Uh-huh.
6  Q.  And I questioned him in your presence about a variety
7      of recordings -- I believe he estimated them to be in
8      the hundreds -- from in or about 1998 to 1993?
9         MR. DAVID:  When you say "uh-huh" --
10        THE WITNESS:  Got it.
11 BY MR. ELKIN:
12 Q.  I'm sorry. 1988 to 1993. Don't hold me to the dates
13     because the record will speak for itself. I'm really
14     referring to the period of time in which he recorded
15     with the Ruby brothers and Chaos Kid. At some point
16     did you learn of the fact that Mr. Mathers
17     participated in the creation of those recordings?
18        MR. DAVID:  I'm going to object to the
19     extent to which the colloquy to that question
20     misstates Mr. Mathers' testimony. However, you can
21     answer the question and what I think is the question,
22     which is at some point did you learn that Mr. Mathers
23     participated in the creation of recordings.
24        THE WITNESS:  With Bassmint Productions.
25        MR. ELKIN:  It's a bad question, but I'm

30

1    trying to get to a background.
2          MR. DAVID: That's why I'm letting him
3    answer it.
4          THE WITNESS: At some point I did learn of
5    the fact that there existed recordings with Eminem and
6    a group called Bassmint Productions, yes.
7    BY MR. ELKIN:
8    Q.  And at what point did you learn that?
9    A.  I knew about Bassmint Productions since probably
10   1996-97.
11   Q.  And how did you learn about it at the time?
12         MR. DAVID: Wait.
13         To the extent to which that calls for you
14   to relate information you may have received as an
15   attorney, I direct you not to answer it. If you
16   received it in some other capacity or way, you may
17   answer it.
18         THE WITNESS: Okay.
19   BY MR. ELKIN:
20   Q.  Let me probe that for a moment. That's actually a
21   good point, and I appreciate Mr. David bringing that
22   up.
23         At what point if ever did you actually
24   become counsel to Mr. Mathers?
25   A.  Well, 1997.

31

1          MR. DAVID: Your hands are covering your
2    mouth and it obscures --
3          THE WITNESS: 1997.
4          MR. DAVID: On the video it obscures.
5    BY MR. ELKIN:
6    Q.  By the way, where were you admitted to practice law?
7    A.  New York.
8    Q.  Were you ever admitted to practice law in Michigan?
9    A.  No.
10   Q.  So you learned about the Bassmint Productions sometime
11   in or about 1996 you said?
12   A.  I don't want to speculate.
13         MR. DAVID: He said '96 to '97.
14   BY MR. ELKIN:
15   Q.  And who told you about it?
16   A.  I don't recall.
17   Q.  And did you ever listen to any of the Bassmint
18   Production recordings at the time?
19   A.  No.
20   Q.  And so this was just a general discussion. If I could
21   paraphrase it, "We made these recordings at this
22   particular time," and you just --
23   A.  We didn't make any recordings.
24         MR. DAVID: Excuse me. Let him finish
25   asking the question, please, and give me a chance to

32

1    object.
2          THE WITNESS: Okay.
3    BY MR. ELKIN:
4    Q.  Anticipating Mr. David's objection and given the fact
5    that it was a lousy question, let me withdraw that and
6    ask you the following. From and after the time that
7    you originally learned about the Bassmint Production
8    recordings, what if anything did you do to try to
9    commercialize them?
10   A.  I never claimed that I knew about any Bassmint
11   Productions recordings in '96-97. I learned about the
12   fact that there existed a group called Bassmint
13   Productions.
14   Q.  And what did you learn about them at the time?
15         MR. DAVID: Again, to the extent to which
16   the information was conveyed to you as other than an
17   attorney, you may answer. If it was as an attorney,
18   please indicate such and don't answer.
19         Go ahead.
20         THE WITNESS: I knew about them before the
21   capacity as an attorney. All I knew was that it was a
22   rap group that Eminem was formerly involved in.
23   BY MR. ELKIN:
24   Q.  Okay. And the some point did you learn that this
25   group actually had recorded music?

33

1    A.  I think that's probably during the course of my
2    attorney-client relationship.
3          MR. DAVID: Then I direct you -- well, then
4    the answer to the question is did you learn. That's a
5    yes or no, and that you can answer.
6          THE WITNESS: Yes, I did.
7    BY MR. ELKIN:
8    Q.  And without getting involved in any contents of
9    communications in your role as counsel to Mr. Mathers
10   or to Shady, could you just tell me the approximate
11   date when you acquired that knowledge?
12         MR. DAVID: Give me one second to think
13   about that.
14         Given the fact that the witness has
15   indicated that he acquired that knowledge in the
16   course of his representation, I will permit him to
17   answer so long as we have a stipulation that
18   permitting him to answer that question will not waive
19   the attorney-client privilege as to any other matter,
20   and I would ask that you extend that stipulation to
21   anything else we have in this deposition so that I
22   will not have to ask you each and every time.
23         MR. ELKIN: I have no problem with that. I
24   won't take anything in response to any of my questions
25   as constituting any waiver.

34

1   MR. DAVID: Okay. So you may answer the
2   question as to approximately when you learned.
3   THE WITNESS: I don't know.
4   BY MR. ELKIN:
5   Q. Was it in 2004?
6   MR. DAVID: That's a yes or no.
7   THE WITNESS: The fact that recordings
8   existed?
9   BY MR. ELKIN:
10  Q. Yes.
11  A. I don't know. It was not in 2004.
12  Q. Was it in 2003?
13  A. I don't know.
14  Q. You don't know what year it was.
15  A. I don't recall when I learned that recordings existed
16  for Bassmint Productions.
17  Q. Do you know whether -- I'm sorry. Do you know whether
18  any effort was made by you or Mr. Mathers to release
19  any of the recordings from basement productions?
20  MR. DAVID: Give me one second.
21  Again, I'm going to permit him to answer
22  but only because we have the stipulation, because I do
23  believe this is clearly within the attorney-client.
24  Go ahead. You may answer.
25  THE WITNESS: There was no effort by me to

36

1   permitting him to answer, so that we will not have to
2   redo some of this if the court agrees with me.
3   BY MR. ELKIN:
4   Q. Just so the record is clear with respect to that, you
5   have conversations with Mr. Mathers in your capacity
6   as counsel I take it. Is that correct?
7   A. Yes.
8   Q. And I also gather that you have conversations with Mr.
9   Mathers in which you are acting as his manager. Is
10  that correct?
11  A. Yes.
12  Q. And I gather you also have conversations with Mr.
13  Mathers in your role as a business partner. I'm using
14  that term loosely, not in a legal definition.
15  A. Yes.
16  Q. Are you generally familiar with the plans and
17  strategies of Shady Records?
18  A. Yes.
19  Q. And in your capacity only as a nonlawyer, was there
20  ever a plan or strategy devised by Shady to release
21  any of the recordings from the Bassmint Productions
22  era?
23  MR. DAVID: I don't know that the witness
24  can divorce the two, but I'll permit him to answer
25  anyway.

35

1   release any recordings from Bassmint Productions. I
2   can't speak on behalf of Mr. Mathers, but from what I
3   know, none of the recordings were released publicly.
4   MR. ELKIN: Okay. Now let me just say, just
5   to be clear, I'm entering into the stipulation that
6   you and I have entered into, but I just want you to --
7   I want the record to be clear that while I'm not
8   taking anything and I agree that there's no waiver, I
9   am not conceding down the road, given the different
10  roles and hats that Mr. Rosenberg wears, that we can't
11  take the position that in fact it's not privileged
12  based on arguments that we will make to the judge.
13  MR. DAVID: Mr. Elkin --
14  MR. ELKIN: I'm assuming we're not arguing
15  about that today. I just want to make that clear.
16  MR. DAVID: Mr. Elkin, let me just confirm.
17  The stipulation is only a prophylactic on my part. It
18  is meant to permit you to inquire without my concern
19  about waiving the attorney-client privilege, if the
20  court agrees with me that such exists. I understand
21  that you are not waiving your claim that there is no
22  privilege that may attach to some of these
23  communications.
24  MR. ELKIN: Thank you.
25  MR. DAVID: That's one of the reasons I'm

37

1   THE WITNESS: As I already answered, there
2   was no plans by Shady Records or myself to ever
3   release the Bassmint Productions era tapes.
4   MR. DAVID: You're not going to play us
5   more music again, are you?
6   MR. ELKIN: Let's take a break.
7   VIDEO TECHNICIAN: Going off the record,
8   the time is 10:57 and ten seconds a.m.
9   (Recess taken at 10:57 a.m.)
10  (Back on the record at 11:04 a.m.)
11  VIDEO TECHNICIAN: We are back on the
12  record, the time is 11:04 and 52 seconds a.m.
13  BY MR. ELKIN:
14  Q. Mr. Rosenberg, I'm going to show you a document which
15  was marked yesterday at Mr. Mathers' deposition as
16  Mathers Exhibit Number 2 which is an assignment. Your
17  counsel has indicated he's got a copy so I'm going to
18  ask you to take a look at that. Take as much time as
19  you need to review it. I'm going to ask you a couple
20  questions about it.
21  A. Yeah.
22  Q. Okay. Is what's been marked as Mathers Exhibit Number
23  2 something that you've seen before, sir?
24  A. Yes.
25  Q. And let me direct your attention, if I may, to the

42

1  A.  At the time or prior to the time?

2  Q.  Prior to or at the time of.

3  A.  Yes.

4  Q.  And when did you listen to them?

5  A.  I don't recall exactly.

6  Q.  Was it right around the time that the assignment was

7    entered into?

8  A.  It was sometime prior.

9  Q.  Within a week or two?

10  A.  No, probably longer than that.

11  Q.  Within six months?

12  A.  Yeah.

13  Q.  And how did you have occasion to first listen to these

14    recordings?

15      MR. DAVID: If it is in connection with

16    your legal representation of Shady or advice which you

17    gave or part of the legal strategy in connection with

18    that, I direct you not to answer. If it was in

19    another capacity that you can segregate, you may

20    answer.

21      THE WITNESS: I can't segregate it.

22  BY MR. ELKIN:

23  Q.  How did you — did somebody present these recordings

24    to you at the time that you listened to them?

25      MR. DAVID: Again, if it is in connection

43

1  with your legal representation, please don't answer.

2      MR. ELKIN: I'm asking him a physical fact.

3  I'm not asking the contents of any confidential

4  communications, if that's your instruction, that's

5  your instruction, but please listen to the question.

6      MR. DAVID: I did listen to the question.

7  Communications have different forms. Communications

8  could be in the form of an act as well as in words, so

9  those are also protected.

10      MR. ELKIN: I'm asking him who brought him

11  the tapes.

12      MR. DAVID: And I'm saying to you that it

13  may still be protected. Give me one moment though,

14  because it may be that I can get you an answer

15  pursuant to our stipulation.

16      (Discussion off the record at 11:12 a.m.)

17      (Back on the record at 11:13 a.m.)

18      MR. DAVID: I can give you a partial

19  answer --

20      MR. ELKIN: Okay. What is it?

21      MR. DAVID: — because there's a part that

22  is not privileged, may not be privileged.

23      Go ahead. You may answer.

24      THE WITNESS: The first time I heard them

25  was on the Source Web site.

44

1  BY MR. ELKIN:

2  Q.  Okay. And when was that? The reason why I ask the

3    question was because this assignment is dated December

4    10, 2003, and maybe I misheard you earlier, but I

5    thought that you had said that you had listened to the

6    tapes some six months earlier.

7      MR. DAVID: No, that's not what he said.

8  Look at the transcript. He says he couldn't tell you

9  when it was. You asked him, "Did you hear it within a

10  couple of weeks?" He says, "I don't know." You said,

11  "Did you hear it within six months?" He said, "I

12  think so," or something to that effect.

13      THE WITNESS: I said yes, I'd heard it

14    within six months.

15  BY MR. ELKIN:

16  Q.  You heard it within six months. You heard it within

17    six months of December the 10, 2003, correct?

18  A.  Six months prior, yeah.

19      MR. DAVID: Within the six-month period.

20  BY MR. ELKIN:

21  Q.  But the very first time — whenever this period of

22    time was within the six-month period of time, the very

23    first time was when you heard it off of the Source Web

24    site. Is that your testimony?

25      MR. DAVID: You have to answer verbally.

45

1      THE WITNESS: As I recall, yes.

2  BY MR. ELKIN:

3  Q.  And prior to your execution of this assignment, other

4    than listening to the music via the Web site, had you

5    heard any other -- had you heard the recordings in any

6    other way?

7      MR. DAVID: Excuse me. Now I will direct

8  him not to answer because the part of the answer which

9  I directed him not to give you before pertains

10  specifically to his role as counsel, so now I'm

11  directing him not to answer that piece of the

12  question.

13      MR. ELKIN: It's just a blanket

14  instruction. You're not going to -- okay.

15      MR. DAVID: Let me explain, Michael. I

16  already know what the answer is, so I gave you the

17  piece as to the first time because I felt that that

18  was not privileged. The second piece, because of what

19  he said to me, I know it is privileged.

20      MR. ELKIN: Okay.

21      MR. DAVID: Now you can test the privilege

22  if you want.

23      MR. ELKIN: That's what I'm doing.

24  BY MR. ELKIN:

25  Q.  You heard the recordings for the first time when they

38

1 third page in the exhibit under the last bit of
2 writing about 30 to 40 percent of the way down. It
3 says, "Assignee, Shady Records, Inc., a New York
4 corporation, by Paul Rosenberg, its authorized
5 signatory," and then there's a "by," and then on top
6 of the words "Shady Records, Inc." there's a — looks
7 like a signature there. Can you identify that
8 signature?
9 A. Yes.
10 Q. And is that your signature?
11 A. Yes.
12 Q. And were you signing in your capacity as an officer of
13 Shady Records, Inc.?
14 A. Yes.
15 Q. And what's your understanding of the document that you
16 signed?
17      MR. DAVID: Objection. You may answer.
18   I assume you're not asking for his legal
19 conclusion.
20      MR. ELKIN: No.
21      MR. DAVID: Go ahead.
22      THE WITNESS: It's an assignment by
23 Marshall Mathers individually as copyright owner in
24 the musical compositions listed therein.
25 BY MR. ELKIN:

39

1 Q. Specifically if you go to page four it refers to Oh
2 Foolish Pride and So Many Styles, correct?
3 A. Yes, it does.
4 Q. And those were the copyright interests that you
5 understood this assignment to be granting from Mr.
6 Mathers to Shady Records. Is that correct?
7 A. Yes.
8 Q. And what were the circumstances surrounding the
9 execution of this document? Why did you enter into
10 this document?
11      MR. DAVID: Give me a moment.
12   To the extent to which it involves legal
13 advice which you provided to Shady or to Mr. Mathers,
14 please do not answer. To the extent to which it
15 involves your participating in some other role, you
16 may answer.
17 BY MR. ELKIN:
18 Q. And specifically I'm just — I'm just asking you in
19 your capacity as representative of Shady Records, what
20 was your understanding as to why you were entering
21 into this agreement at this time?
22      MR. DAVID: I repeat my cautionary
23 instruction. To the extent to which it involves a
24 legal strategy or legal advice, please do not comment.
25 To the extent to which you can separate out a

40

1 different role that you had —
2      THE WITNESS: I can't separate a different
3 role.
4      MR. DAVID: Okay. In that case then, I
5 direct you not to answer.
6 BY MR. ELKIN:
7 Q. Now the two songs that are listed on page four of the
8 exhibit were to your understanding part of what we
9 referred to as the Bassmint Productions recordings?
10      MR. DAVID: Objection. It's part of what
11 you've referred to as Bassmint Productions recordings.
12 BY MR. ELKIN:
13 Q. Did you understand that these particular recordings
14 were recorded with Bassmint — at the time that
15 Bassmint Productions was banded together?
16 A. Yes.
17 Q. And why, if you know why, why were these the only two
18 recordings laid out in this assignment?
19      MR. DAVID: Give me one moment.
20   If you can segregate the role as counsel,
21 whatever role you may have had that wasn't an
22 attorney, you can answer that.
23      THE WITNESS: I can't separate them.
24      MR. ELKIN: You're instructing?
25      MR. DAVID: I'm instructing not to answer.

41

1 We can have a stipulation that he'll follow whatever
2 instructions I give him in terms of answering
3 attorney-client privileged matters, so you don't have
4 to ask him each time.
5      MR. ELKIN: I'm going to ask you each time.
6      MR. DAVID: I'll save you that.
7 BY MR. ELKIN:
8 Q. At the time this assignment was —
9      MR. DAVID: By the way, by making an
10 objection, I'm not even agreeing on the question of
11 whether it's irrelevant these are the only two, but
12 it's not necessary because I'm not going there right
13 now.
14      MR. ELKIN: Well, that's a good thing since
15 this is a deposition.
16      MR. DAVID: Yes, but as you learned
17 yesterday from the court, you can't just go on a
18 freelance fishing mission.
19      MR. ELKIN: You take a risk in a
20 deposition. Let's not belabor this.
21      MR. DAVID: I agree. Let's not belabor it.
22 BY MR. ELKIN:
23 Q. At the time this assignment was entered into, Mr.
24 Rosenberg, had you had occasion to listen to the
25 recordings that are the subject of the assignment?

46

```
1    were up on the Source Web site.  At some point in time
2    subsequent to your hearing them on the Web site and
3    prior to your execution of the assignment, you heard
4    them again in circumstances that your counsel is
5    currently instructing you not to answer on the grounds
6    of attorney-client privilege.
7              MR. DAVID:  Excuse me.  It's not only
8    attorney-client privilege.  There's is also work
9    product and investigator privilege.
10             MR. ELKIN:  Well, which ones are you
11   asserting here?
12             MR. DAVID:  I'm asserting all three of
13   those.
14             MR. ELKIN:  You're asserting all three of
15   them.
16   BY MR. ELKIN:
17   Q.  How many times -- without getting into the
18   circumstances for the moment, how many times did you
19   hear the recording after you initially heard it off of
20   the Source Web site and prior to the execution of the
21   assignment?
22   A.  More than once, less than four.
23   Q.  And was the time -- withdrawn.  And did you get the --
24   did you hear the recordings -- withdrawn.
25             Were the recordings that you listened to
```

47

```
1    after you initially listened to them via the Source
2    Web site the same recordings that you heard on the
3    Source Web site?
4              MR. DAVID:  I'm going to direct you not to
5    answer that question.  It's part of the communication
6    I assert the previous three privileges.  Talking about
7    only the period between the first time he heard it and
8    the assignment date.
9              MR. ELKIN:  You're not even going to let
10   him testify as to whether or not what he heard was the
11   same thing?  Is that your instruction?
12             MR. DAVID:  That's correct because that's a
13   communication.
14             MR. ELKIN:  We're going to definitely be
15   back here again.
16             MR. DAVID:  No.  We will be back here again
17   if the court agrees with you.
18             MR. ELKIN:  Yes.
19             MR. DAVID:  You remember the last time you
20   told me we were going to be back here again, the court
21   didn't agree with you.
22             MR. ELKIN:  No.  I basically said let's get
23   the judge on the phone.
24             MR. DAVID:  That's not what I mean.  You've
25   already taken the issue of attorney-client privilege
```

48

```
1    to the judge.
2              MR. ELKIN:  You know what?  Let's not
3    belabor this, Donald.
4              MR. DAVID:  Excuse me.  You made a
5    statement.
6              MR. ELKIN:  Your arguments are what they
7    are.  The bottom line is you're giving him
8    instructions in areas frankly which I feel are
9    palpably improper.  I understand that you have an
10   interest in wanting to do this.  That's fine.  You
11   know, you're absolutely right.  I shouldn't make
12   predictions as to what's going to happen or not.
13   Let's just move on --
14             MR. DAVID:  I agree.
15             MR. ELKIN:  -- with the questions.
16             Just so I understand it, the instruction
17   that you've given him with respect to his not being
18   able to testify as to whether or not the recordings
19   were the same with regard to one of the up to four
20   occasions, I was going to ask him with respect to the
21   others.  Your instructions are going to be the same,
22   so in the event I want to test this with the court, I
23   don't want to have to repeat each of the questions,
24   but I'm happy to do so if you want.
25             MR. DAVID:  I actually need to ask him a
```

49

```
1    question off the record before I do that.  Give me one
2    moment.
3              MR. ELKIN:  Sure.
4              VIDEO TECHNICIAN:  Going off the record,
5    the time is 11:18 and 39 seconds a.m.
6              (Discussion off the record at 11:18 a.m.)
7              (Back on the record at 11:19 a.m.)
8              VIDEO TECHNICIAN:  We are back on the
9    record at 11:19 and 47 seconds a.m.
10             MR. DAVID:  I will permit you to inquire as
11   to So Many Styles because, after conferring with Mr.
12   Rosenberg, I believe that his answer does not
13   implicate any of the privileges we have discussed, if
14   you choose to do so.
15             MR. ELKIN:  I thought I had chosen to do so
16   earlier.
17   BY MR. ELKIN:
18   Q.  I will ask you about So Many Styles and then I'll come
19   back to the Oh Foolish Pride so that we can further
20   flesh out exactly where the boundaries are.
21             With regard to So Many Styles, I take it
22   that the first time that you listened to that
23   recording was when you visited the Source Web site.
24   Is that correct?
25   A.  That's what I already said, yeah.
```

50

1    Q.  Now there came a point thereafter where you had access
2        to a recording of So Many Styles that came to you in a
3        way other than via the Source Web site.  Is that
4        correct?
5    A.  I didn't say that.
6    Q.  Okay.  Did there come a point in time where you
7        learned -- withdrawn.  Did there come a point in time
8        after you saw So Many Styles on the Source Web site
9        that you thereafter had access to a different
10       recording?
11           MR. DAVID:  Wait.  Of So Many Styles?
12           MR. ELKIN:  Of So Many Styles.
13           THE WITNESS:  No, I don't believe so.
14   BY MR. ELKIN:
15   Q.  So when was the -- other than access through the
16       Source Web site as to So Many Styles, did there ever
17       come a point thereafter where you had access to that
18       music other than through the Source Web site?
19   A.  Yes, but it was only copies of what was on the Source
20       Web site.
21   Q.  Okay.  So only in connection with things that were
22       produced in connection with this case.  Is that what
23       you're saying?
24   A.  I don't understand the question.
25   Q.  My question is you said that you got it through the

51

1        Source Web site originally, and then the only other
2        rendition that you received was from a copy of what
3        was on the Source Web site.  Is that correct?
4    A.  That's correct, prior to yesterday, yes.
5    Q.  Now with respect to Oh Foolish Pride, as I understand
6        it, counsel is not going to permit further inquiry in
7        response to the questions that I previously propounded
8        as to whether or not the recording you listened to
9        subsequent to your first accessing it via the Source
10       Web site was the same.
11           MR. ELKIN:  Is that your current
12       instruction?
13           MR. DAVID:  That is correct.
14           MR. ELKIN:  And I assume, Mr. David, that
15       that's the instruction you would give if I asked him
16       the second or third or even up to fourth time that he
17       claims that he listened to the recording, just for the
18       record.
19           MR. DAVID:  That is correct.
20   BY MR. ELKIN:
21   Q.  Can you tell me whether or not -- withdrawn.
22           MR. DAVID:  Let me just make it clear, Mr.
23       Elkin.  The reason why is because each time subsequent
24       to that, based upon my communication with this
25       witness, it was in his role as attorney or as part of

52

1        the legal work in connection with this matter, and
2        that is the reason why I am not permitting him to
3        answer further.
4            MR. ELKIN:  I understand that is your
5        position, and for the sake of argument I was prepared
6        to accept your position and I will say that not being
7        able to identify who the parties are I think is not
8        getting me to where I feel that we need to go to
9        discover the facts.  It's not an issue you and I are
10       going to resolve today.
11           MR. DAVID:  I agree.
12           MR. ELKIN:  It's going to have to be
13       resolved through judicial intervention.  I'm going to
14       ask some more questions.  If you want to instruct him
15       you can.
16           MR. DAVID:  May I make a suggestion if you
17       would -- if I could, and it's up to you whether you
18       follow it or not.  You might want to try to identify
19       the parties who were present at the time he listened
20       to it.
21           MR. ELKIN:  That's exactly where I was
22       going.
23           MR. DAVID:  Okay.
24           MR. ELKIN:  I had asked that question
25       earlier.

53

1            MR. DAVID:  No, I don't think you had.
2            MR. ELKIN:  Let's not argue about it.  I
3        believe I had.  You believe I hadn't.
4            MR. DAVID:  It makes a difference.  Feel
5        free to do that.
6            MR. ELKIN:  Let's go forward.
7    BY MR. ELKIN:
8    Q.  Okay, Mr. Rosenberg, the very first time where you had
9        access to the recording after you had first accessed
10       it via the Source Web site, could you tell me who was
11       present when you then listened to the recording?
12   A.  Which recording?
13   Q.  We're talking about Oh Foolish Pride.  Based on your
14       testimony, So Many Styles is something that you claim
15       you have not listened to subsequent to the Source --
16       withdrawn.  So Many Styles is something that I think
17       we have your story down.  If I understand it
18       correctly, you listened to it via the Source Web site,
19       and you only heard renditions of that recording via
20       the Source Web site or copies made therefrom, and you
21       only heard a different version yesterday for the first
22       time.  Do I have that right?
23   A.  That's the truth.
24   Q.  Now with regard to Oh Foolish Pride, there is a time
25       subsequent to your accessing the recording via the

54

1   Source Web site that you first listened to a recording
2   of it in some other way other than via the Source Web
3   site. Who was present during your listening to that
4   recording?
5         MR. DAVID: Please just give him the names
6   of the people present. Don't discuss anything else
7   concerning it.
8         THE WITNESS: For the first time?
9   BY MR. ELKIN:
10  Q. Yes. I think – I believe you said there were up to
11    four times, so let's just start with the first time.
12  A. I think it was just myself and David Cohen.
13  Q. Who is David Cohen?
14  A. And –
15  Q. Sorry.
16  A. And Jimmy Iovine.
17  Q. Who is David Cohen?
18  A. David Cohen is an employee of Interscope Records.
19  Q. Is he an attorney?
20  A. No.
21  Q. Okay. So were the three of you -- where were the
22    three of you physically located at the time?
23  A. In David's office.
24  Q. Is that in Los Angeles?
25  A. Santa Monica.

55

1  Q. Santa Monica. Okay. And what was the purpose of your
2    meeting, the three of you?
3        MR. DAVID: Give me a second.
4    You can answer.
5        THE WITNESS: The purpose was multifold,
6    but it was mainly to discuss strategy on what we were
7    gonna do in response to the matters of this case.
8  BY MR. ELKIN:
9  Q. Why was Interscope involved in this case?
10  A. Because they obviously have an interest in Eminem's
11    career.
12  Q. Have you ever – has Interscope ever retained you as
13    counsel to perform any legal work?
14  A. Directly?
15  Q. Yes.
16  A. No.
17  Q. And you were not acting as their lawyers in connection
18    with this matter. Is that correct?
19  A. I was acting as a lawyer for the venture, sure.
20  Q. You were acting as a lawyer for the venture. Was the
21    venture – how was the – withdrawn. Was Interscope
22    ever – okay. I withdraw that.
23       My understanding of the testimony that you
24    provided earlier, and correct me if I'm wrong – I'm
25    sure your counsel will jump right on it when I make

56

1   one word mistake here -- was that the joint venture
2   that Shady and Interscope have relate to the
3   development of other artists. Did I get that wrong?
4        MR. DAVID: Ask him.
5        THE WITNESS: Artists other than who?
6  BY MR. ELKIN:
7  Q. Other than Eminem.
8  A. No, you didn't get that wrong.
9  Q. With regard to the meeting that you had, I gather that
10    it was either Mr. Cohen or Mr. Iovine that had the
11    recording, or did you have it?
12       MR. DAVID: All right. Now I direct you
13   not to answer.
14       MR. ELKIN: Grounds?
15       MR. DAVID: Grounds, attorney-client
16   privilege. He was at that meeting as attorney for the
17   venture in which Interscope, acting through its
18   officers, Mr. Cohen and Mr. Iovine, were discussing
19   matters with him. I direct him not to answer.
20       MR. ELKIN: But Eminem's not part of their
21   venture.
22       MR. DAVID: That's not the issue. The
23   issue is he was still giving them advice.
24       THE WITNESS: Eminem is part of our
25   venture.

57

1       MR. DAVID: Excuse me. Okay. But that is
2   not the issue. The issue is that he was still giving
3   his clients legal advice. Whether you deem it not --
4   you deem that Eminem is not part of the venture,
5   that's your business, but still giving his clients
6   legal advice.
7       MR. ELKIN: Okay. Look, I'm not going to
8   belabor the issue, the issue with regard to Eminem. I
9   know that Eminem is involved in the venture as an
10   equity participant, but we're talking about his
11   career. I'm not going to get involved in a long
12   debate or discussion with you about it.
13       THE WITNESS: Can I point something out?
14       MR. DAVID: If you want, you can probe the
15   issue of whether Eminem is part of the venture, if you
16   choose.
17       MR. ELKIN: I think we have the testimony.
18  BY MR. ELKIN:
19  Q. If you want to add to that, go ahead.
20  A. Okay. He executive produces every project as Eminem
21    on Shady Records. He produces a lot of the songs that
22    are released on Shady Records.
23  Q. Anything else?
24  A. His celebrity is inextricably linked to the success of
25    Shady Records.

58

1  Q. Anything else?
2  A. Just wanted to point that out.
3  Q. Okay. I got it. Had --
4      MR. ELKIN: You're still instructing.
5      MR. DAVID: Yes.
6  BY MR. ELKIN:
7  Q. So the three of you sat around and listened to the
8     recording?
9      MR. DAVID: Direct you not to answer.
10     I'm not going to permit you -- let's make
11     it clear. I'm not going to permit you to inquire any
12     further into that meeting, Mr. Elkin.
13  BY MR. ELKIN:
14  Q. Okay. Was the recording any different from the
15     recording that you heard on the Source Web site?
16     MR. DAVID: Again, direct you not to
17     answer.
18  BY MR. ELKIN:
19  Q. What did Mr. Cohen and Mr. Iovine say to you at that
20     meeting?
21     MR. DAVID: Direct you not to answer.
22  BY MR. ELKIN:
23  Q. Was there a subsequent point in time in which you
24     listened to Oh Foolish Pride from this meeting and
25     prior to your execution of the assignment?

59

1  A. I don't recall.
2  Q. How much money was paid to Mr. Mathers in respect of
3     the assignment of his interest in these two songs?
4  A. Specifically for this interest?
5  Q. Yes.
6      MR. DAVID: If you know other than reading
7      it, you can answer. If you've got to read the
8      document --
9      THE WITNESS: I don't know.
10     MR. DAVID: -- then the document will tell
11     you if it's there.
12  BY MR. ELKIN:
13  Q. Okay. Separate and apart from reading the document,
14     do you recall whether or not Mr. Mathers was paid any
15     consideration in respect of the assignment of his
16     interest in these two purported copyrights?
17  A. Don't recall.
18  Q. What if anything would refresh your recollection?
19     MR. DAVID: You know what refresh your
20     recollection means in this context.
21     THE WITNESS: I don't think anything would.
22  BY MR. ELKIN:
23  Q. I gather if there was a check that was issued by Shady
24     to Mr. Mathers, that might refresh your recollection,
25     correct?

60

1  A. If there was?
2      MR. DAVID: Well, it might be evidence of
3      the payment, but it might not refresh his
4      recollection. You and I both know that refreshing
5      one's recollection means one then has an epiphany
6      where one all of a sudden has a memory. Now if you'd
7      like us to find out whether there's a check and you
8      want to make that request, I'll be glad to entertain
9      it.
10     MR. ELKIN: Sure. I accept your
11     invitation.
12     MR. DAVID: Just send me a letter asking me
13     so I'll remember because otherwise I'll forget.
14     MR. ELKIN: Okay.
15  BY MR. ELKIN:
16  Q. Let me ask you to turn, Mr. Rosenberg, if I could to
17     the fourth page of the Mathers Exhibit Number 2,
18     referring to the list of compositions and master
19     recordings included in the assignment. Do you recall
20     whether Shady did any due diligence to determine who
21     if anyone participated in any of the music composition
22     creations --
23     MR. DAVID: Object, vague.
24     MR. ELKIN: These two --
25     MR. DAVID: I'm sorry. I thought you were

61

1  done.
2  BY MR. ELKIN:
3  Q. -- of these two songs?
4      MR. DAVID: Object, vague as to what due
5      diligence means, but you may answer if you understand
6      it.
7      THE WITNESS: Define due diligence in this
8      circumstances.
9  BY MR. ELKIN:
10  Q. Well, in this particular instance let's take one song
11     at a time. Let's take one copyright interest at a
12     time so as to avoid the objection as to form.
13     With regard to So Many Styles, the
14     recording itself, what was done, if you know, to
15     determine who else participated in the producing and
16     recording of that particular song?
17  A. Prior to the date of the filing -- the date of this
18     assignment?
19  Q. Correct.
20     MR. DAVID: Give me one moment, please.
21     If you did anything outside your role or if
22     you have any knowledge -- let me change that --
23     outside your role as counsel -- and here I'm not
24     asking you to segregate. I'm saying if you have any
25     knowledge outside your role as counsel, you may answer

**62**

1  as to that knowledge.

2  THE WITNESS: I can't separate it.

3  MR. DAVID: I'm not asking you to separate

4  in this instance. All right? I'm asking you whether

5  you acquired any knowledge that wasn't in your role as

6  counsel.

7  THE WITNESS: No.

8  MR. DAVID: Okay. Then I'll assert the

9  privilege.

10  BY MR. ELKIN:

11  Q. So did you yourself investigate or cause to have

12  investigated who else participated in these particular

13  -- in the recording of So Many Styles?

14  MR. DAVID: Again, other than in your role

15  as counsel if you did that, you may answer.

16  THE WITNESS: No, none other than in my

17  role as counsel.

18  MR. ELKIN: And you're instructing him to

19  not talk about what he did.

20  MR. DAVID: As counsel, that's correct.

21  MR. ELKIN: Okay.

22  BY MR. ELKIN:

23  Q. Now, as a 40 percent owner and officer and director of

24  Shady Records, did you make any inquiry as to who

25  actually participated if anyone other than Mr. Mathers

**63**

1  in the producing and recording of So Many Styles?

2  MR. DAVID: Although the question is

3  compound, if you did it in any of those capacities,

4  you may answer.

5  THE WITNESS: Other than as either parallel

6  to my role as counsel?

7  MR. DAVID: No. If it was parallel to your

8  role as counsel, then answer the question. If it was

9  in your role as counsel, then say that it was in your

10  role as counsel and I'll direct you not to answer, but

11  if it was merely parallel, then you may answer the

12  question.

13  THE WITNESS: Can we go off the record for

14  a second?

15  MR. DAVID: Yeah.

16  VIDEO TECHNICIAN: Going off the record,

17  the time is 11:37 and 50 seconds a.m.

18  (Discussion off the record at 11:37 a.m.)

19  (Back on the record at 11:38 a.m.)

20  VIDEO TECHNICIAN: We are back on the

21  record at 11:38 and 18 seconds a.m.

22  THE WITNESS: I'm gonna answer in a

23  parallel role. The only thing I did to investigate --

24  was it you said who were the authors?

25  BY MR. ELKIN:

**64**

1  Q. Who was the producing and recording.

2  A. The only thing I did was had conversations with Mr.

3  Mathers.

4  Q. And as a result of those conversations that you had

5  with Mr. Mathers, did you learn of anyone other than

6  Mr. Mathers who participated in the recording or

7  producing of those recordings?

8  A. Of both of them?

9  Q. Yes.

10  A. Yes.

11  Q. And who did you learn?

12  A. Matt Ruby, Mike Ruby, James Deel and Mr. Mathers.

13  Q. And what did they -- this is with regard to which,

14  this is with regard to which or both of the recordings

15  at issue?

16  A. Both.

17  Q. And do you know what each of them did in connection

18  with these recordings?

19  A. I know what I was told each of them did.

20  Q. Could you state what you learned?

21  A. Yeah. I get the two Ruby brothers confused because I

22  don't know either one of them very well or at all.

23  Q. As you can tell yesterday, I got them confused as

24  well.

25  A. Let's say that Mannix was producer, and I don't know

**65**

1  whether that's Matt or Mike Ruby. Butterfingers -- in

2  producer, I mean the person who created the music for

3  the tracks. Butterfingers was the deejay who provided

4  scratching or turntable manipulation sounds. Mr.

5  Mathers performed vocals and wrote vocals, and Mr.

6  Deel performed and wrote vocals as well, lyrics,

7  whatever you want to call them.

8  MR. DAVID: Michael, I'm not sure that you,

9  because of the form of your questioning which I didn't

10  object to, whether you're clear as to which of these

11  gentlemen did these functions on each of these

12  recordings as opposed to both of these recordings, but

13  I'm just pointing that out to you.

14  MR. ELKIN: No. I understand. I think his

15  testimony together with the witness's yesterday I can

16  sort of piece it together.

17  MR. DAVID: It's your business. It's your

18  deposition.

19  BY MR. ELKIN:

20  Q. Now do you know a gentleman by the name of Gregory

21  Weir, W-e-i-r?

22  MR. DAVID: You can answer the question yes

23  or no.

24  THE WITNESS: Yes.

25  BY MR. ELKIN:

66

1   Q. To your knowledge is he a private investigator?
2          MR. DAVID: You can answer the question.
3          THE WITNESS: Yes.
4   BY MR. ELKIN:
5   Q. Did Shady Records retain Mr. Weir as a private
6   investigator?
7          MR. DAVID: You can answer the question.
8          THE WITNESS: Yes.
9   BY MR. ELKIN:
10  Q. Can you -- do you remember when Shady Records retained
11  Mr. Weir as an investigator?
12  A. When exactly?
13  Q. Yes.
14  A. No.
15         MR. DAVID: Give me a chance to object or
16  give you an instruction. It's not a problem. I would
17  have directed you to answer the question anyways. I
18  know we're in the cautionary area, so I just want to
19  keep tabs on it.
20  BY MR. ELKIN:
21  Q. Were you the representative of Shady that engaged on
22  behalf of Shady the private investigator?
23         MR. DAVID: You may answer.
24         THE WITNESS: Was I the only representative
25  or was I a representative?

67

1   BY MR. ELKIN:
2   Q. Were you a representative, yeah.
3   A. Yes.
4   Q. Were there others of Shady?
5   A. Yes.
6   Q. Who? Who else?
7          MR. DAVID: You can answer that question.
8          THE WITNESS: Howard Hertz.
9   BY MR. ELKIN:
10  Q. Anyone else?
11  A. I don't think so.
12  Q. What was the purpose of your retaining Mr. Weir?
13         MR. DAVID: Now I'm going to assert
14  privilege, direct him not to answer.
15         MR. ELKIN: This is a privilege founded
16  under the law of Michigan.
17         MR. DAVID: That is correct, and, if I
18  might, you might want to inquire as to where Mr. Weir
19  was engaged, if you choose, your business, just as
20  predicate.
21  BY MR. ELKIN:
22  Q. I assume you're going to tell me that Mr. Weir was
23  engaged in the state of Michigan, correct?
24  A. Uh-huh.
25         MR. DAVID: Uh-huh doesn't work for us.

68

1          THE WITNESS: Yes.
2          MR. ELKIN: And I gather you're instructing
3   him not to answer the question on the grounds of that
4   privilege.
5          MR. DAVID: That is correct.
6   BY MR. ELKIN:
7   Q. Did Shady pay Mr. Weir for his services?
8          MR. DAVID: You may answer that question.
9          THE WITNESS: Yes.
10  BY MR. ELKIN:
11  Q. How much did Shady pay Mr. Weir for his services?
12         MR. DAVID: Give me a moment.
13         I'm going to permit him to answer, but I
14  would like our stipulation to extend to the
15  investigator privilege as well as the attorney-client
16  privilege.
17         MR. ELKIN: There will be no inadvertent
18  waiver by virtue of his answer to this question.
19         MR. DAVID: You may answer the question, if
20  you know.
21         THE WITNESS: I don't recall exactly how
22  much it was.
23  BY MR. ELKIN:
24  Q. Did Shady pay him directly?
25  A. I don't recall.

69

1   Q. If you would have paid him directly, would it have
2   been by check?
3          MR. DAVID: As opposed to small bills you
4   mean?
5          You can answer the question.
6          THE WITNESS: Yes, it would have been by
7   check.
8   BY MR. ELKIN:
9   Q. If you had occasion to review your bank statements,
10  you may be able to determine whether or not Shady
11  issued a check to him. Is that correct? Would that
12  be fair?
13  A. Yes.
14  Q. It's also possible that Mr. Hertz paid him directly
15  and just billed it as a disbursement, correct?
16  A. It's possible.
17  Q. Prior to your retaining Mr. Weir in connection with
18  this particular, this particular -- withdrawn. I know
19  you said you didn't remember, but let me just see if I
20  can pin it down to a specific year at least. Is it
21  your recollection that you retained -- that Shady
22  retained Mr. Weir in or about the year 2004 --
23  withdrawn -- in or about the latter part of 2003?
24         MR. DAVID: If you know.
25         THE WITNESS: Yes.

70

1  BY MR. ELKIN:
2  Q.  And was this the first time that Shady actually
3      engaged the services of a private investigator?
4  A.  Shady Records? ·
5  Q.  Yes.
6  A.  I'm not sure.
7  Q.  You don't -- as you sit here today --
8  A.  We've used other private investigators within our
9      companies.  I don't recall whether Shady specifically
10     has hired a private investigator prior to Mr. Weir.
11 Q.  And did you retain the private investigator to meet
12     with Mannix to get an assignment of his copyright
13     interest in respect of the two recordings that are at
14     issue in this case?
15         MR. DAVID:  Direct you not to answer.
16         MR. ELKIN:  I'm going to move into -- in a
17     related area but I'm going to be moving into a
18     different area, if you want to take a break we can do
19     that, or otherwise we can keep going.
20         MR. DAVID:  Let's keep going.
21         (Discussion off the record at 11:48 a.m.)
22         (Back on the record at 11:48 a.m.)
23         MR. ELKIN:  Mark this as Rosenberg Number
24     1.
25         MARKED BY THE REPORTER:

71

1          DEPOSITION EXHIBIT NUMBER 1
2          11:48 a.m.
3          MR. DAVID:  Can we go off the record for
4  one moment?
5          VIDEO TECHNICIAN:  The time is 11:48 and 36
6  seconds a.m.
7          (Recess taken at 11:48 a.m.)
8          (Back on the record at 12:05 p.m.)
9          VIDEO TECHNICIAN:  We are back on the
10 record, the time is 12:05 and 22 seconds p.m.
11         MR. DAVID:  Let the record indicate that I
12 have given a document which I received last night to
13 defendant's counsel.  The first time I received it, as
14 I indicated, was last night and I thought it might be
15 relevant to today's deposition so I've turned it over.
16 We'll formally produce it in a supplemental
17 production.
18         MR. ELKIN:  I appreciate the -- you handed
19 me the document shortly before the break.  I did call
20 my office and learned that, based upon the content of
21 this document, it would appear to have been responsive
22 to a much earlier document demand.  That's something
23 you and I can take up in a different exchange.  I
24 appreciate the opportunity to examine at least this
25 witness with respect to it, and I may get to that a

72

1      little later in the deposition.
2  BY MR. ELKIN:
3  Q.  What I'd like to hand to you, Mr. Rosenberg, is a
4      document which we have appropriately entitled
5      Rosenberg Number 1 and ask you, sir, whether that's
6      something you can identify as your having seen before.
7  A.  Yes.
8  Q.  When was the first time that you recall having seen
9      this?
10 A.  I'm not sure.
11 Q.  Do you know what it is?
12 A.  Yes.
13 Q.  What is it?
14 A.  It's an assignment in the rights of Michael Ruby for
15     the works listed therein.
16 Q.  And this is -- you understood this to be an assignment
17     to your investigator Gregory Weir?
18         MR. DAVID:  Objection to the
19     characterization as investigator.  You can answer as
20     to whether it was Gregory Weir or not.
21         THE WITNESS:  Yes, I do.
22 BY MR. ELKIN:
23 Q.  Was this assignment in furtherance of the services for
24     which Shady engaged Mr. Weir?
25         MR. DAVID:  Direct you not to answer.

73

1  BY MR. ELKIN:
2  Q.  Drop your eye down to the handwriting toward the
3      bottom of the page.  Do you see the wording sort of --
4      in handwriting sort of slightly above and to the right
5      of "Michael James Ruby"?
6  A.  Uh-huh.
7  Q.  Can you identify that handwriting, whose handwriting
8      that is?
9  A.  Not for sure, no.
10 Q.  It's not your handwriting.
11 A.  I don't think so but I'm not sure.
12 Q.  Did you have occasion to review this document prior to
13     it being signed?
14 A.  I don't recall.
15 Q.  That's all I have for that.  One moment.
16         MR. ELKIN:  Let's mark this, Judy, as
17     Rosenberg Number 2.
18         MARKED BY THE REPORTER:
19         DEPOSITION EXHIBIT NUMBER 2
20         12:08 p.m.
21 BY MR. ELKIN:
22 Q.  Mr. Rosenberg, Judy's just handed to you a document
23     we've marked as Rosenberg Number 2, Exhibit Number 2.
24     Can you identify that as something you've seen before?
25 A.  Yes.

74

1 Q. And what is Rosenberg Number 2, if you know?
2 A. This document is an assignment by Greg Weir of his
3     rights in the listed compositions.
4 Q. Do you know what gave rise to this assignment?
5          MR. DAVID: Wait. I'm sorry. Give me one
6     moment.
7          I'm going to object to the form of that
8     question.
9          MR. ELKIN: I'm going to rephrase it.
10 BY MR. ELKIN:
11 Q. Do you know the circumstances surrounding Mr. Weir's
12     execution of this assignment to Shady Records, Inc.?
13          MR. DAVID: Give me a moment.
14          I believe that that is going to implicate
15     both the attorney-client and the investigative
16     privilege. I would ask that you try to refine your
17     question to flush that out or at least set the
18     foundation for it, if you would.
19          MR. ELKIN: Why don't you give the
20     instruction, and I'll see what I can do.
21          MR. DAVID: Okay. To the extent to which
22     this implicates the attorney-client privilege as to
23     your role or the investigator privilege as to Mr.
24     Weir's role, I would ask you not to answer the
25     question. To the extent to which you can answer the

75

1     question as a result of one of your parallel roles at
2     Shady Records, please do answer the question.
3          I mean I think the question is phrased too
4     broadly. That's why I asked you to do it, but I'll
5     give the direction.
6          THE WITNESS: In one of my parallel roles,
7     so Shady could own the compositions listed on the
8     page.
9 BY MR. ELKIN:
10 Q. Okay. And did you negotiate with Mr. Weir with
11     respect to the terms of this assignment?
12          MR. DAVID: By assignment, I presume you
13     mean the document, the specific document.
14          MR. ELKIN: Correct.
15          MR. DAVID: That's a yes or no question.
16          THE WITNESS: Yes.
17 BY MR. ELKIN:
18 Q. And with regard to the negotiations, what was said?
19          MR. DAVID: Wait.
20          Mr. Elkin, if you can isolate to the
21     negotiations solely as it relates to this document and
22     not as to Mr. Weir's role as private investigator, I
23     may be able to get you an answer to your question
24 BY MR. ELKIN:
25 Q. Okay. Let me -- just for purposes of short-circuiting

76

1     this, I'm not asking you to divulge the contents for
2     the moment of any communications between you and Mr.
3     Weir in your role as counsel to Shady and his role as
4     private investigator. I'm not agreeing that that is a
5     privilege that should prevent me from asking that
6     question or any other question. I only realize and
7     recognize that your counsel has asserted that
8     privilege and that I don't want to waste anyone's time
9     here.
10          My question is with regard to the actual
11     terms of the assignment itself, separate and apart
12     from Mr. Weir's role as private investigator, what
13     were the discussions that you had with him with regard
14     to the terms of this legal document?
15          MR. DAVID: If any.
16          THE WITNESS: The terms?
17 BY MR. ELKIN:
18 Q. Yes.
19 A. You mean -- the terms are outlined on the document.
20 Q. Did you and he discuss them at the time it was being
21     prepared?
22 A. Prior to, yeah.
23 Q. What did you say to him and what did he say to you,
24     again, with the caveat of your counsel's admonition?
25          MR. DAVID: If you can.

77

1          THE WITNESS: I said Shady wants to own
2     these and he said okay.
3 BY MR. ELKIN:
4 Q. Did -- how did you learn that he actually acquired the
5     interest of these particular works?
6          MR. DAVID: Now I think we're getting too
7     close to the assignment that he had received from
8     Shady. I'm going to direct the witness not to answer.
9     You are free to ask questions, however, to form the
10     predicates for that, if you wish, and to see how far
11     you can go.
12          MR. ELKIN: I don't know how I could break
13     it down any further, Mr. David, but --
14          MR. DAVID: Well --
15          MR. ELKIN: I appreciate your sentiment of
16     trying to be a nice guy, but I'm trying to ask this
17     witness what I think are probing questions. You've
18     asserted a privilege, and there's not much I can do
19     about it at this particular point in time. My ability
20     to ask any further questions is hampered. As a result
21     I'm going to move on to a different document.
22          Let's mark this, Judy, as Rosenberg Number
23 3.
24          MARKED BY THE REPORTER:
25          DEPOSITION EXHIBIT NUMBER 3

78

1    12:14 p.m.
2  BY MR. ELKIN:
3  Q.  Mr. Rosenberg, the court reporter has handed you a
4     document which has been marked as Rosenberg Number 3.
5     Take a moment to review the document and tell me
6     whether or not you can identify it as something you've
7     seen before.
8  A.  Yeah, I've seen this before.
9  Q.  Did you see this document — what is Rosenberg Number
10    3, if you know?
11  A.  It's an assignment by Mr. Weir to, relative to the
12    works listed therein.
13  Q.  Okay.  It's an assignment from Mr. Weir — you
14    understood it to be an assignment from Mr. Weir to
15    Shady Records, Inc.?  Is that correct?
16  A.  That's correct.
17  Q.  And did you have occasion to review this assignment
18    prior to it being signed?
19  A.  I don't recall.
20  Q.  The document, if you flip to page five of the
21    document, and there's a signature above the name Rand
22    Hoffman.
23  A.  Uh-huh.
24  Q.  By the way, do you recognize Mr. Hoffman's signature?
25  A.  Not necessarily, no.

79

1  Q.  Now was there any, to your knowledge any corporate
2    resolution passed appointing Mr. Hoffman as an
3    officer —
4        MR. DAVID:  Objection, asked and answered
5    previously.
6  BY MR. ELKIN:
7  Q.  — of your company?
8        MR. DAVID:  You can answer.
9        THE WITNESS:  No, there wasn't.
10  BY MR. ELKIN:
11  Q.  Was there any corporation resolution passed to permit
12    Mr. Hoffman to sign on behalf of Shady Records as it
13    relates to this particular document?
14  A.  In particular?
15  Q.  Yes.
16  A.  No.
17  Q.  Mr. Hoffman never received anything in respect of his
18    signing this document from Shady Records?  Is that
19    correct?
20        MR. DAVID:  What do you mean by anything?
21  BY MR. ELKIN:
22  Q.  Did he receive any compensation for his signature on
23    this piece of paper?
24  A.  No.
25  Q.  If you — I direct your attention to page one of the

80

1    assignment, specifically about 60 percent of the way
2    down, next to the heading "2, Consideration."  In the
3    second line there's an arrow, something that's
4    pointing to handwritten language which appears to set
5    forth the consideration of $15,000 plus expenses in
6    respect to the consideration here.  Do you know
7    whether or not the $15,000 that's identified as
8    consideration was in fact paid to Mr. Weir?
9  A.  I believe it was.
10  Q.  And do you know who paid that money?
11  A.  I don't recall.
12        MARKED BY THE REPORTER:
13        DEPOSITION EXHIBIT NUMBER 4
14        12:18 p.m.
15  BY MR. ELKIN:
16  Q.  Mr. Rosenberg, I've handed to you what's been marked
17    as Rosenberg Number 4.  Take a moment to take a look
18    at it, and let me know if you could whether or not
19    this is something that you've seen before.
20  A.  Yes, I've seen this before.
21  Q.  Did you have occasion to review this at or around the
22    time it was signed?
23  A.  I don't recall.
24  Q.  What did — what's your understanding of Rosenberg
25    Number 4?

81

1  A.  It's a confidentiality agreement.
2  Q.  Between Shady Records and Mr. Weir?  Is that correct?
3  A.  Yes.
4  Q.  And I direct your attention to the second page of the
5    exhibit.  You'll see a couple of references to Rand
6    Hoffman —
7  A.  Uh-huh.
8  Q.  — on behalf of Shady Records, and Rand Hoffman
9    appears to be — it's a signature that appears to
10    indicate that it's Rand Hoffman on behalf or by Rand
11    Hoffman on behalf of Shady Records, Inc.
12        Again, my question with respect to this
13    document, is there any corporate resolution that was
14    passed providing for Mr. Hoffman to actually sign this
15    document?
16  A.  No.
17        MARKED BY THE REPORTER:
18        DEPOSITION EXHIBIT NUMBER 5
19        12:20 p.m.
20  BY MR. ELKIN:
21  Q.  Mr. Rosenberg, the court reporter has handed you a
22    document which we've marked for identification as
23    Rosenberg Number 5.  Take a moment to take a look at
24    that, and let me know whether or not this is a
25    document that you've seen before.

82

1   A.  Yes, I've seen it.
2   Q.  And do you recall whether or not you've seen this for
3       the first time at or around the time that it was
4       prepared?
5   A.  I believe I saw it prior to when it was -- I believe I
6       saw it immediately when it was prepared.
7   Q.  Are you -- on behalf of Shady you authorized this to
8       be filed with the copyright office?  Is that correct?
9           MR. DAVID:  Object to the form.
10          THE WITNESS:  Yes.
11  BY MR. ELKIN:
12  Q.  Now this particular -- you understood this particular
13      work -- withdrawn.  This covers the work -- this
14      appears to cover the work So Many Styles.  Would you
15      agree with me?
16          MR. DAVID:  Give me one second.
17  BY MR. ELKIN:
18  Q.  Direct your attention to line one, just to sort of cut
19      through this a little bit.
20  A.  Yes, I would agree with you.
21  Q.  And do you have an understanding as to -- I know that
22      you didn't participate in this, but do you have an
23      understanding generally as to when So Many Styles was
24      first created, the sound recording itself?  I just
25      direct your attention to item number three about 85

83

1       percent of the way down?
2           MR. DAVID:  Excuse me.  If you have an
3       understanding, you can answer.  If you're merely
4       reading from the document, let us know that.
5           THE WITNESS:  I have an understanding
6       independent from the document.
7   BY MR. ELKIN:
8   Q.  Okay.  And when -- what's your understanding as to
9       when that recording was made?
10  A.  On or around 1989.
11  Q.  And in 1989 was Shady Records, Inc. a corporation in
12      existence?
13  A.  As I already answered, no, it was not.
14  Q.  Now this particular copyright registration lists as an
15      author Marshall Bruce Mathers, the Third.  Is it your
16      understanding, sir, that there were in fact other
17      authors with respect to the recording So Many Styles
18      other than Mr. Mathers?
19          MR. DAVID:  Object to the form.
20          THE WITNESS:  At this point or prior to
21      when this was created?
22  BY MR. ELKIN:
23  Q.  Well, at this point.
24  A.  Yes.
25  Q.  And who were the others to your knowledge that would

84

1       constitute authors of this particular work?
2           MR. DAVID:  Excuse me.  Notice he said to
3       your knowledge, not your understanding in this
4       instance.  You can answer in that context.
5           THE WITNESS:  Define the difference.
6       Knowledge, do I know for sure?
7   BY MR. ELKIN:
8   Q.  Let me rephrase the question because this is not an
9       effort to trick you.  I'm just trying to get some
10      information, and I appreciate the subtlety that your
11      counsel is attempting to drive home.
12          In addition to Mr. Mathers who's listed as
13      an author, do you have an understanding as to who else
14      is an author of this particular work, So Many Styles,
15      the sound recording?
16  A.  Yes.
17  Q.  And who were those individuals?
18  A.  My understanding is that Mannix, maybe Ruby -- maybe
19      Butterfingers Ruby and James Deel and Marshall
20      Mathers.
21          MARKED BY THE REPORTER:
22          DEPOSITION EXHIBIT NUMBER 6
23          12:25 p.m.
24  BY MR. ELKIN:
25  Q.  Mr. Rosenberg, I've handed to you what's been marked

85

1       as Rosenberg Number 6.  Take a moment to review the
2       document.  When you have a moment, please let me know
3       whether this is something you can identify as your
4       having seen before.
5   A.  I'm not sure whether I've seen this one.
6   Q.  Okay.  Was it your custom and practice, has it been
7       your custom and practice to review copyright
8       registrations for sound recording copyrights of Shady
9       Records before they're being filed?
10  A.  Not necessarily, no.
11  Q.  Is it something that you just trust to others and
12      sometimes you get involved, sometimes you won't?
13  A.  Well, as we said before, outside of the subject of
14      this litigation we haven't had occasion to file
15      copyright registrations, so there wouldn't be a custom
16      and practice.
17  Q.  But would you -- with regard to the content in the
18      copyright registration -- I know that you don't have
19      responsibility with respect to the actual filing, but
20      to the extent is it your company's practice and custom
21      to actually review the contents of a registration
22      before filing it with a government office?
23  A.  There isn't a custom and practice.
24  Q.  So it could happen or it could not.  Is that your
25      testimony?

86

1  MR. DAVID: Argumentative. You can answer.
2  THE WITNESS: Typically I would review
3  something like this. I just don't recall whether I've
4  seen this one.
5  BY MR. ELKIN:
6  Q.  And when was the — and sitting here today, you have
7  no recollection as to ever having seen this prior to
8  your deposition today?
9  MR. DAVID: Objection. That's not what he
10  said.
11  THE WITNESS: I didn't say I have no
12  recollection. I said I don't recall seeing it.
13  BY MR. ELKIN:
14  Q.  Okay. And do you -- and at any point prior to today.
15  A.  Do I recall seeing it at any point prior to today?
16  Q.  Yes, yes, that's my question.
17  A.  I'm not sure. I don't know.
18  Q.  I'll ask you a couple more questions about this
19  document anyway. I realize you haven't .estified that
20  you've seen it before. Let me direct your attention,
21  if I may, to the second page of this exhibit. There's
22  a — if you take a look about 60 percent of the way
23  down in the box which is headed "Correspondence,"
24  there's a reference there to an Eric Schwartz, and
25  then if you drop your eye down three columns below

87

1  you'll see the name "Eric Schwartz" as a signatory.
2  Do you see that?
3  A.  Yes.
4  Q.  I'm not going to ask you any questions about the
5  attorney -- that would invoke the attorney-client
6  privilege here, but was Mr. Schwartz authorized to
7  sign this document on behalf of Shady Records, Inc.?
8  MR. DAVID: You can answer.
9  THE WITNESS: Yes.
10  BY MR. ELKIN:
11  Q.  Now do you have an understanding as to when Oh Foolish
12  Pride was created?
13  A.  Yes.
14  Q.  And when — your understanding is what when it was
15  created?
16  A.  On or about 1989.
17  Q.  And Shady Records, Inc. was not incorporated as of
18  that day, correct?
19  A.  No, it was not.
20  MR. DAVID: Previously asked and answered.
21  You can answer again.
22  BY MR. ELKIN:
23  Q.  And what is your current understanding as to the
24  authors of Oh Foolish Pride?
25  A.  Marshall Mathers —

88

1  MR. DAVID: You can answer.
2  THE WITNESS: -- Butterfingers, Mannix
3  maybe -- I mean Butterfingers Ruby maybe and Mannix
4  Ruby. I don't know whether James Deel was involved in
5  it or not.
6  MR. DAVID: Michael, does it make sense to
7  continue on because we will finish reasonably soon, or
8  does it make sense to break for lunch?
9  MR. ELKIN: I think I can finish in half an
10  hour.
11  (Discussion off the record at 12:31 p.m.)
12  (Back on the record at 12:31 p.m.)
13  VIDEO TECHNICIAN: We're going off the
14  record. This also marks the end of tape number one in
15  the deposition of Paul Rosenberg. The time is 12:32
16  and five seconds p.m.
17  (Recess taken at 12:32 p.m.)
18  (Back on the record at 12:42 p.m.)
19  VIDEO TECHNICIAN: We are back on the
20  record. This marks the beginning of tape number two
21  in the deposition of Paul Rosenberg. The time is
22  12:42 and 15 seconds p.m.
23  MARKED BY THE REPORTER:
24  DEPOSITION EXHIBIT NUMBER 7
25  12:41 p.m.

89

1  BY MR. ELKIN:
2  Q.  Mr. Rosenberg, the court reporter has handed to you a
3  document which has been marked as Rosenberg Number 7.
4  Your counsel, as he stated earlier in the deposition,
5  provided me a copy of this document and it's marked
6  highly confidential today, so I've not had occasion to
7  spend very much time with it. It is one page, and
8  I've taken a look at it during the break, and I want
9  to ask you some questions about it.
10  Can you identify Rosenberg Number 7 as a
11  document that you've seen before?
12  A.  Yes.
13  Q.  What is Rosenberg Number 7?
14  A.  It's an agreement assigning rights of James Deel.
15  Q.  And what rights are being assigned, if you know?
16  A.  Rights to musical compositions, copyrights.
17  Q.  Drop your eye down to the end of the letter, nearly
18  end of the letter. Under the words "Very truly yours,
19  Shady Records, Inc." there's a signature. Can you
20  identify that signature?
21  A.  Yes, it's mine.
22  Q.  And when did you sign this document?
23  A.  Not sure, but by looking at the date on it, I would
24  say on or about the date it was created.
25  Q.  January 30, 2004?

90

1  A.  Yes.
2  Q.  And prior to today did you ever turn this document
3      over to your lawyers?
4          MR. DAVID:  Objection.  I told you that --
5      first of all, I told you that I got it yesterday.
6          MR. ELKIN:  Withdrawn.
7  BY MR. ELKIN:
8  Q.  Prior to yesterday, did you ever turn this document
9      over to your lawyers?
10 A.  I thought we had sent it prior but apparently we
11     didn't, so I gave him a copy yesterday.
12 Q.  Were you -- did you participate in the negotiations
13     surrounding this particular document?
14         MR. DAVID:  Assumes facts not in evidence.
15     You can answer.
16         THE WITNESS:  Yes.
17 BY MR. ELKIN:
18 Q.  And you negotiated on behalf of Shady Records.  Is
19     that correct?
20 A.  Yes.
21 Q.  And with whom did you have such negotiations?
22 A.  James Deel.
23 Q.  And did you meet with him personally or physically?
24 A.  As it relates to this?
25 Q.  Well, let's just say prior to -- have you ever met

91

1      James Deel?
2  A.  Yeah.
3  Q.  On how many -- when did you first meet him?
4  A.  Around 1997.
5  Q.  And did you remain in contact with him from 1997 to
6      the present?
7  A.  Be more specific.
8  Q.  Well, when you met him in 1997, what were the
9      circumstances surrounding your meeting him?  Did you
10     meet him at a club?
11 A.  No.  He was a roommate with Mr. Mathers, and I met him
12     at the house they were living in.
13 Q.  And did you have occasion to meet with him over the
14     past six months?
15 A.  Yes.
16 Q.  And did you have occasion to meet with him in
17     connection with this particular -- the subject matter
18     of this particular document?
19 A.  Physically, no.
20 Q.  Did you have conversations with him regarding the
21     subject matter of this document?
22 A.  Yeah.  As I said before, I negotiated some of the
23     terms of it with him.
24 Q.  How many conversations would you say you had with him
25     about this document?

92

1  A.  Two or three.
2  Q.  And all of them were done via the telephone?
3  A.  Yes.
4  Q.  Were there any E-mail exchanges?
5  A.  I don't believe so.
6  Q.  Did -- and did -- how was it that you and he first
7      began to negotiate with regards to this document?  Did
8      you contact him or did he contact you?
9  A.  Mr. Mathers spoke to him, and I was put in contact
10     with him through him.
11 Q.  Okay.  And do you know the subject matter of the --
12     withdrawn.  Did Mr. Mathers tell you what he and Mr.
13     Deel spoke about?
14         MR. DAVID:  You can answer that yes or no,
15     just yes or no.
16         THE WITNESS:  Yes.
17 BY MR. ELKIN:
18 Q.  And can you tell me what Mr. Mathers relayed to you
19     with regard to what he said to Mr. Deel?
20         MR. DAVID:  Give me one second.
21         If Mr. Mathers relayed that to you in your
22     role as counsel, then please indicate that and I would
23     direct you not to answer.  If on the other hand he
24     relayed it to you in one of your parallel roles with
25     the company, then you may relate what he said to you.

93

1          THE WITNESS:  In my parallel role he said
2      that he had spoke to Mr. Deel and asked him whether it
3      would be possible to, for lack of a better term, buy
4      him out of his rights in recordings that he had done
5      with him prior, and Mr. Deel agreed that he would do
6      so.
7  BY MR. ELKIN:
8  Q.  And there's a, there is a compensation provision laid
9      out in the second paragraph of this letter in the
10     amount of $5,000.  Is that your -- with some royalty
11     percentage and mechanical royalty rate.  That's your
12     understanding of the compensation that was paid to Mr.
13     Deel in connection with this document?
14 A.  $5,000 was paid.
15 Q.  Any additional consideration than that?
16 A.  Other than the royalty?
17 Q.  Yes.
18 A.  No, but the royalty was only put in there because he
19     wanted to be assured that we weren't just gonna turn
20     around and sell everything.  We had never had any
21     intention of doing so.
22 Q.  Now is there any document that is -- any schedule
23     that was originally appended to this particular
24     document?
25 A.  No.  It was meant to be all encompassing.

94

1  Q.  There's no specific titles of any recordings or music
2      compositions that's included here.  Is there any other
3      such document that exists?
4  A.  No.  It was intentionally broad.
5  Q.  And who prepared this document, if you know?
6  A.  I don't recall.
7  Q.  One of Shady's lawyers?
8  A.  I think Theo Sedlmayr.
9  Q.  In your discussions with James Deel, did you ask him
10     whether or not he participated in the recording of Oh
11     Foolish Pride?
12 A.  I don't believe I did.
13 Q.  In your discussions with Mr. Deel, did you ask him
14     whether or not he participated in the recording So
15     Many Styles?
16 A.  I don't believe I did.
17         MR. ELKIN:  And, Mr. David, for the record,
18     you're going to be producing this to us under Bates
19     stamp number --
20         MR. DAVID:  That is correct.
21         MR. ELKIN:  -- so we can have it as part of
22     the formal production.  Is that correct?
23         MR. DAVID:  That is correct.  As he
24     explained to you, my sole purpose in giving it to you
25     at this time was so that you would have an opportunity

95

1      to inquire.
2  BY MR. ELKIN:
3  Q.  From and after the time that this particular document
4      was assigned, that is to say after January 30, 2004,
5      did you cause there to be any filing with the
6      copyright office with respect to including any
7      reference to Mr. Deel as an author to either Oh
8      Foolish Pride or So Many Styles?
9  A.  No.
10 Q.  Have you -- I take it you've had conversations with
11     Jimmy Iovine about this lawsuit.  Is that correct?
12         MR. DAVID:  One second.
13     You can answer that yes or no.
14         THE WITNESS:  Yes, I have.
15 BY MR. ELKIN:
16 Q.  Did you have any conversations with -- Mr. Iovine is
17     the senior executive of Interscope Records, correct,
18     to your knowledge?
19 A.  He's the senior executive?  You mean --
20 Q.  Is he in charge of Interscope Records to your
21     knowledge?
22 A.  Yes.
23 Q.  And outside of Mr. Iovine's role as a member of the
24     joint venture and any role that you claim you may have
25     had as counsel to the venture, did you have any

96

1      discussions with Mr. Iovine about this lawsuit?
2  A.  Yes.
3  Q.  And how many such conversations did you have with him?
4  A.  Many.  I don't recall.
5  Q.  Can you tell me briefly what the sum and substance of
6      those conversations were?
7  A.  You'd have to be more specific.  There's many
8      conversations.
9  Q.  Okay.  Did Mr. Iovine express a view as to the merits
10     of your particular claim in this case?
11 A.  That's outside of my role as a business member of
12     Shady Records.
13 Q.  What about with regard to -- did he express a role --
14     did he express a view with regard to what the Source
15     had done by virtue of making these recordings
16     available?  When I say these recordings, I'm referring
17     to Oh Foolish Pride and So Many Styles or excerpts
18     therefrom.
19         MR. DAVID:  We're also talking -- I just
20     want to make sure that we're clear that we're talking
21     about discussions that are outside of Iovine's role as
22     a member of the joint venture and the role that Paul
23     may have had as counsel to the joint venture.
24         MR. ELKIN:  Correct.
25         MR. DAVID:  Okay.

97

1         THE WITNESS:  Outside of his role as a
2  member of the joint venture completely?
3         MR. DAVID:  Yeah.  That's what the question
4  was.
5         THE WITNESS:  Not really.
6         MR. DAVID:  Actually let me change that.
7  It's got to be in the conjunctive.  In other words, it
8  has to be outside of his role in the joint venture and
9  your role as counsel to the joint venture.  All right?
10 So, in other words, if you were just sort of shooting
11 the breeze with him and didn't have anything to do
12 with the fact that you were the lawyer for the joint
13 venture, that you can discuss, but if it was within
14 those two roles you can't discuss it.
15         THE WITNESS:  I would say it was always
16 related to those two roles.
17         MR. DAVID:  Okay.
18         MR. ELKIN:  Well, that's your -- you're
19 giving him instruction not to answer based on the
20 attorney-client privilege?
21         MR. DAVID:  If in fact the conversation was
22 with Iovine as a member of the joint venture or
23 representing a member of the joint venture, to be more
24 precise, and his role as the attorney for the joint
25 venture, yes, I'm giving him that instruction.

**98**

```
1        THE WITNESS: But if there was times, to be
2    clear, that we had conversations where it wasn't in my
3    role as counsel —
4        MR. DAVID: Then you have to answer the
5    question.
6        THE WITNESS: Okay. We can do that.
7  BY MR. ELKIN:
8  Q.  Did — so subject to those confines, did Mr. Iovine
9    express a view to you with respect to what the Source
10    had done in terms of releasing excerpts of Oh Foolish
11    Pride and So Many Styles?
12        MR. DAVID: I would object to the form of
13    the question in that it says excerpts because we don't
14    agree with that, but you may answer.
15        THE WITNESS: Yes.
16  BY MR. ELKIN:
17  Q.  And what did he say?
18  A.  I mean I guess that answer is in relation to my role
19    as an attorney.
20        MR. DAVID: But then if the conversation —
21    I'm confused for a moment, Paul.
22        THE WITNESS: He had asked whether we had
23    any conversations together outside of the role as —
24        MR. DAVID: I see what you're saying.
25    You're saying that the specific topic he's asking was
```

**99**

```
1    in the role as an attorney.
2        THE WITNESS: Yes.
3        MR. DAVID: I got it, I misunderstood. So
4    in that situation then, can I just make sure that I
5    understand because I don't want to unnecessarily
6    interfere. Are you saying that any conversations that
7    you had concerning Mr. Iovine's view with respect to
8    what the Source had done in terms of releasing
9    excerpts of Oh Foolish Pride and So Many Styles was in
10    the role as your being an attorney for the joint
11    venture? Is that what you're saying?
12        THE WITNESS: Most of them, most of them,
13    yes, but if you want to get more specific, there may
14    be times where the role didn't exist.
15  BY MR. ELKIN:
16  Q.  And that's really what I'm zeroing in on. I think
17    that's what counsel and I are struggling with. I'm
18    only asking you — I'd like to ask you about the
19    others, and I have been asking you about the others.
20        MR. DAVID: I won't let you.
21  BY MR. ELKIN:
22  Q.  He's given you an instruction and he's not permitting
23    that to take place, so there's not much I can do about
24    that given how — given the rules of depositions and
25    the fact that you can't — or I'm electing at this
```

**100**

```
1    point not to get the judge on the phone to get these
2    issues resolved because there are many issues. I'm
3    just zeroing in on the issue and the area about which
4    we don't currently have a problem, which is where you
5    are not — where you're having these conversations
6    outside of your official capacities —
7  A.  Right.
8  Q.  -- for lack of better words.
9  A.  Okay.
10  Q.  Outside of the -- outside of those roles and your
11    official capacities, did he express a view to you with
12    respect to the activities that you all are complaining
13    about in this lawsuit?
14  A.  Did he express a view, yes.
15  Q.  And what was that view?
16  A.  Outside of my role as a legal representative? Can we
17    go off the record for a second? I just want to
18    determine whether this is —
19        MR. DAVID: Off the record.
20        VIDEO TECHNICIAN: Going off the record,
21    the time is 12:58 and 13 seconds p.m.
22        (Discussion off the record at 12:58 p.m.)
23        (Back on the record at 12:58 p.m.)
24        VIDEO TECHNICIAN: We are back on the
25    record at 12:58 and 48 seconds p.m.
```

**101**

```
1        MR. DAVID: I am not certain that this
2    answer is in fact outside the scope from Mr.
3    Rosenberg's representation, but subject to our
4    stipulation, I'll nonetheless permit him to answer it.
5    Go ahead.
6        THE WITNESS: He expressed a view that if
7    indeed the Source was planning on releasing the
8    material that's the subject of this lawsuit, that we
9    should attempt to prohibit that.
10  BY MR. ELKIN:
11  Q.  Anything else that he said to you?
12  A.  I mean, you know, we can go into tons of stuff. He
13    had meetings with them. There was plenty, but that's
14    the general view that he expressed.
15  Q.  Okay. Mr. Iovine had meetings with members of the
16    Source?
17  A.  Sure.
18  Q.  To discuss this lawsuit?
19  A.  Yes. Well, prior to the lawsuit.
20  Q.  Mr. Rosenberg, in connection with this particular
21    lawsuit, what are you — that is to say, Shady, what
22    are you complaining about that the Source has done
23    unlawfully?
24        MR. DAVID: I'm going to object. That
25    calls for a legal opinion on the part of this witness,
```

102

1  and he's not here to testify as an expert legal
2  opinion.
3  BY MR. ELKIN:
4  Q.  Do you feel that you -- do you feel that Shady has
5  been damaged in connection with this case?
6        MR. DAVID:  And it's not his role to say
7  that.  He's here as a PMK for Shady and that's not his
8  role.
9        MR. ELKIN:  So you're not going to allow
10  him to answer that question?
11        MR. DAVID:  I'll let you ask him about the
12  damages that Shady may have suffered if you want.
13        MR. ELKIN:  In order for me to understand
14  about the damages they suffered, I want to know how
15  they claim they're injured.
16        MR. DAVID:  You mean other than the fact
17  that you infringed on their copyrights?  Go ahead.
18  Ask your question.
19        MR. ELKIN:  You know you shouldn't be doing
20  that.
21        MR. DAVID:  Go ahead.  Ask your question.
22        Well, you shouldn't be asking this question
23  of this witness.
24        MR. ELKIN:  You know --
25        MR. DAVID:  Come on.

103

1        MR. ELKIN:  I'm going to take care of this
2  colloquy and the coaching in another way, but let me
3  ask the questions my way.
4        MR. DAVID:  Ask your questions properly.
5  Go ahead.
6        MR. ELKIN:  No.  I will ask the questions
7  the way I'm going to ask the questions, regardless of
8  your characterization.  I'll ask it one more time.  If
9  I don't get the answer, then -- an answer, then I will
10  move on with all of the risk attendant to your
11  objection and obstructing the examination.
12  BY MR. ELKIN:
13  Q.  Mr. Rosenberg, do you believe that Shady has been
14  injured as a result of the actions you complain of in
15  this case?
16        MR. DAVID:  You may answer.
17        THE WITNESS:  Yes.
18  BY MR. ELKIN:
19  Q.  How have you been injured?
20        MR. DAVID:  By you, you mean Shady.
21        MR. ELKIN:  Yes, Mr. David, yes.
22        MR. DAVID:  Go ahead.
23        THE WITNESS:  Shady has been injured by
24  virtue of an unlawful exploitation of copyrights.
25  BY MR. ELKIN:

104

1  Q.  Any other way in which they have been damaged?
2  A.  There may be more.
3  Q.  As you sit here today can you think of anything else?
4  A.  That's the primary damage.
5  Q.  How have you been damaged by the unfair exploitation
6  of your copyrights?
7  A.  I believe --
8  Q.  What damages have you suffered?
9  A.  What damages have we suffered?  Are we on trial to
10  prove damages here?  I don't have to answer that.
11        MR. DAVID:  He's asking you the question if
12  you know of any damages.
13        MR. ELKIN:  Let me ask the question,
14  please, Mr. David.
15        MR. DAVID:  You may answer.
16  BY MR. ELKIN:
17  Q.  Do you know of any damages that Shady has incurred?
18  A.  Sure.
19  Q.  What are they?
20  A.  We've lost the right to publish or distribute this
21  material whether we desire to or not.
22  Q.  Anything else?
23  A.  Lost the right of first publication of the material
24  and the right of whether it was intended to be
25  released at all, which it wasn't.

105

1  Q.  Anything else?
2  A.  That's about it.
3  Q.  How do you -- can you, can you measure the damages
4  that you have suffered by virtue of having lost the
5  right to publish or distribute these recordings?
6  A.  Can I personally measure it?
7  Q.  Yes.
8  A.  Independently?
9  Q.  Yes.
10  A.  No.
11  Q.  Can you do it?  Do you know who can?
12  A.  I assume we can with our -- you know who can.  The
13  judge and jury can.
14  Q.  And do you know anything that you would attempt to --
15  that you personally would say to the judge or jury to
16  show your damages?
17        MR. DAVID:  Give me one second.
18        To the extent to which this calls for you
19  to reveal discussions that you've had with counsel
20  representing Shady as to the strategy of the case and
21  what we intend to do, I direct you not to answer both
22  on the attorney-client privilege and work product
23  privilege.
24        THE WITNESS:  I can't answer it then.
25        MR. ELKIN:  I'm not asking for that.  Maybe

106

1    it's a poorly worded question.
2    BY MR. ELKIN:
3    Q.  All I want to know is, do you know how much money you
4        feel you've lost as a result of what you're
5        complaining about?
6    A.  I have not calculated that.
7    Q.  And the same is true with respect to the so-called
8        loss of first right of publication?
9    A.  I've not calculated that.
10           MR. ELKIN:  Well, I think subject to the
11       rulings of the judge and in respect of a motion to
12       compel which may or may not require further
13       questioning, I have no further questions at this time.
14           MR. DAVID:  Have a good day, Paul.
15           VIDEO TECHNICIAN;  This concludes the
16       deposition of Paul Rosenberg.  The time is now 1:05
17       and 42 seconds p.m.
18           (The deposition was concluded at 1:42 p.m.
19       Signature of the witness was not requested by
20       counsel for the respective parties hereto.)
21
22
23
24
25

107

1              CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN  )
3              ) SS
4    COUNTY OF OAKLAND  )
5
6        I, Judith C. Werner, a Notary Public in and for
7    the above county and state, do hereby certify that the
8    above deposition was taken before me at the time and
9    place hereinbefore set forth; that the witness was by
10   me first duly sworn to testify to the truth, and
11   nothing but the truth; that the foregoing questions
12   asked and answers made by the witness were duly
13   recorded by me stenographically and reduced to
14   computer transcription; that this is a true, full and
15   correct transcript of my stenographic notes so taken;
16   and that I am not related to, nor of counsel to either
17   party nor interested in the event of this cause.
18
19
20
21
22        Judith C. Werner, CSR-2349
23        Notary Public,
24        Oakland County, Michigan
25   My Commission expires: 7-2-07

108

1              INDEX TO EXAMINATIONS
2
3    Witness                        Page
4    PAUL ROSENBERG
5
6    EXAMINATION BY MR. ELKIN:...................... 4
7
8              INDEX TO EXHIBITS
9
10   Exhibit                        Page
11   (Exhibits retained by counsel.)
12
13   DEPOSITION EXHIBIT NUMBER 1.................. 71
14   DEPOSITION EXHIBIT NUMBER 2.................. 73
15   DEPOSITION EXHIBIT NUMBER 3.................. 77
16   DEPOSITION EXHIBIT NUMBER 4.................. 80
17   DEPOSITION EXHIBIT NUMBER 5.................. 81
18   DEPOSITION EXHIBIT NUMBER 6.................. 84
19   DEPOSITION EXHIBIT NUMBER 7.................. 88
20
21
22
23
24
25



1            IN THE DISTRICT COURT OF THE UNITED STATES

2            FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4   SHADY RECORDS, INC.,

5                    Plaintiff,

6       vs.                        Case No. 03-CV 9944

7   SOURCE ENTERPRISES, INC., DAVID

8   MAYS, RAYMOND SCOTT p/k/a RAY

9   BENZINO, and BLACK ENTERPRISES/

10  GREENWICH STREET GROWTH MANAGEMENT,

11  L.L.C.,

12                    Defendants.            **CONFIDENTIAL**

13  _____

14

15            HIGHLY CONFIDENTIAL

16

17       The Deposition of GREGORY WIER,

18       Taken at 1760 South Telegraph Road, Suite 300,

19       Bloomfield Hills, Michigan,

20       Commencing at 11:02 a.m.,

21       Monday, June 7, 2004,

22       Before Kimberly R. Hunt, CSR-5223.

23

24

25

Page 2

1  APPEARANCES:
2  DONALD N. DAVID
3  Fischbein, Badillo, Wagner, Harding
4  909 Third Avenue
5  New York, New York 10022
6  (212) 453-3750
7      Appearing on behalf of the Plaintiff.
8
9  THOMAS P. LANE
10  Thelen, Reid & Priest, L.L.P.
11  875 Third Avenue
12  New York, New York 10022
13  (212) 603-6731
14      Appearing on behalf of the Defendants.
15
16  STEVEN Z. COHEN
17  SAMUEL S. HERMAN
18  Cohen, Lerner & Rabinovitz, P.C.
19  26862 Woodward Avenue, Suite 200
20  Royal Oak, Michigan 48067
21  (248) 691-2200
22      Appearing on behalf of the Witness.
23
24  ALSO PRESENT:
25  Debra Cort

Page 3

1  Bloomfield Hills, Michigan
2  Monday, June 7, 2004
3  11:02 a.m.
4
5          GREGORY WIER,
6  was thereupon called as a witness herein, and after
7  having first been duly sworn to testify to the truth,
8  the whole truth and nothing but the truth, was
9  examined and testified as follows:
10          MARKED BY THE REPORTER:
11          DEPOSITION EXHIBIT NUMBERS 1-10
12          11:02 a.m.
13          EXAMINATION
14  BY MR. LANE:
15  Q. Mr. Wier, as Mr. David just said, my name is Thomas
16      Lane. I represent what we refer to as the Source
17      Defendants in this case, which is Source Enterprises,
18      David Mays and Raymond Scott. I'm going to ask you a
19      series of questions. I'd like you to answer them as
20      best as you could. Have you ever been deposed before?
21  A. Yes.
22          MR. COHEN: Counsel, I apologize, but I'd
23      like to place something on the record in terms of the
24      jurisdiction in this matter, if I can. My name is
25      Steven Cohen. I represent Mr. Wier, along with Sam

Page 4

1  Herman, who is here. Mr. Wier is here voluntarily at
2  the request of Ms. Anders, your associate. As
3  appearing voluntarily, we were not -- although we have
4  received a copy of the subpoena, identifying the
5  eastern district of Michigan, no subpoena was filed
6  with the Federal District Court in Detroit for
7  enforcement. There was one in this case, in your New
8  York case that was filed for enforcement against Mr.
9  Bolos, apparently, but none against Mr. Wier. So
10  we're here voluntarily, but we want it understood that
11  by appearing he is not subjecting himself to the
12  jurisdiction of any New York Federal District Court.
13  He is still claiming jurisdiction only within
14  Michigan. That having been said, go right ahead.
15          MR. LANE: I appreciate representation.
16  I'm under the impression that the subpoena was
17  properly served, but I'm happy here's he's now so we
18  want to proceed.
19  BY MR. LANE:
20  Q. I'm going to ask you a series of questions, I believe
21      there will be a number of objections, so please let
22      Mr. David an opportunity to object before you respond.
23      If I ask you anything and you don't understand it, let
24      me know and I will try and rephrase it, okay?
25  A. Yes.

Page 5

1  Q. How many times have you been deposed?
2  A. Four.
3  Q. And were those always in connection with your role as
4      a private investigator?
5  A. Some.
6  Q. How many of those fours were?
7  A. One.
8  Q. During the course of that deposition did you actually
9      give testimony?
10  A. Yes.
11  Q. Were any objections raised during the course of that
12      deposition with respect to what you could say?
13  A. Not that I recall.
14  Q. And what was the nature of that case?
15  A. Noncompete violation.
16  Q. And who did you represent?
17          MR. DAVID: Say that again.
18  A. Noncompete violations.
19  BY MR. LANE:
20  Q. Who was your client in connection with that case?
21  A. Company called —
22          MR. COHEN: Wait.
23          MR. DAVID: Wait. I don't have the right
24      to assert a privilege on that.
25          MR. COHEN: Let me explain something to

**Page 6**

```
1    you, Greg.  If the client's name itself is
2    confidential, even if it was in a public record in
3    another case, that's a different issue, because that's
4    something that's not confidential, but who your client
5    was is.  I don't want you to violate your license.
6          THE WITNESS:  Okay.
7          MR. COHEN:  So to the extent -- do you know
8    who -- can we go off the record for a second?
9          MR. LANE:  Sure.
10         (Discussion off the record at 11:04 a.m.)
11         (Back on the record at 11:05 a.m.)
12         MR. COHEN:  To the extent that Mr. Wier --
13   I represent that Mr. Wier testified as a witness in a
14   case pending before Judge Andrews of the Oakland
15   County Circuit Court.  To the extent that that is a
16   public record, I will arrange for the information to
17   be provided to you, Mr. Lane.
18         MR. LANE:  Let me cut to the chase with
19   respect to this area.
20   BY MR. LANE:
21   Q.  Do you know of any time during the course of any
22       testimony you've ever given, whether at deposition or
23       at trial, that a privilege has been asserted with
24       respect to your own knowledge or activities as a
25       private investigator?
```

**Page 8**

```
1    A.  Approximately ten years.
2    Q.  In total, how long have you been acting as a private
3        investigator?
4    A.  Almost 20 years.
5    Q.  Did you go to college?
6    A.  Yes.
7    Q.  Where did you go?
8    A.  Cleary College.
9    Q.  What was your major there?
10   A.  Business.
11   Q.  When did you graduate?
12   A.  I didn't.
13   Q.  When did you leave?
14   A.  1984.
15   Q.  From 1984 to the present, you've always been employed
16       as a private investigator?
17   A.  For the most part.
18   Q.  How do you go about getting licensed in this state as
19       a private investigator?
20   A.  You apply through the Department of Consumer Industry.
21   Q.  When did you apply?
22   A.  Numerous times throughout 20 years.
23   Q.  Do you have to continue reapplying to get your license
24       renewed?
25   A.  That's correct.
```

**Page 7**

```
1    A.  Not that I recall.
2    Q.  Who are you employed by currently?
3    A.  Progressive Security.
4    Q.  And how long have you been with Progressive Security?
5    A.  1998.
6    Q.  Were you employed by a security firm or private
7        investigator firm prior to that?
8    A.  Yes.
9    Q.  And what was that?
10   A.  Strategic Protection Group.
11   Q.  And how long were you with Strategic Protection Group?
12   A.  Approximately four years.
13   Q.  Anything prior to that?
14   A.  Yes.
15   Q.  What was that?
16   A.  Advanced Security.
17   Q.  How long were you with Advanced Security?
18   A.  Couple of years.
19   Q.  Anything prior to Advanced?
20   A.  Yes.
21   Q.  What was that?
22   A.  Burns International.
23   Q.  Was that also a security company?
24   A.  Yes.
25   Q.  How long were you with Burns?
```

**Page 9**

```
1    Q.  How long does the license last before you have to get
2        it renewed?
3    A.  Anywhere from one to three years.
4    Q.  Why does it vary, do you know?
5    A.  Because it used to be licensed by the State Police and
6        in 2004 they went to a new act, registered with the
7        Department of Consumer Industry.
8    Q.  So did it used to be one year and now it's three or
9        did it used to be three and now it's one or --
10   A.  Used to be three, now it's one and two.
11   Q.  Do you have any reason why it would be one or two with
12       respect to your personal license?
13   A.  Sure, because it's two licenses.  One's a security
14       guard and one's a private investigator, one's for one,
15       one's for two.
16   Q.  Do you have any other licenses aside from as a
17       security guard or as a private investigator?
18   A.  Yes.
19   Q.  What would that be?
20   A.  A company called Prudential Protective Services.
21   Q.  What is that?
22   A.  Same thing, private security guard investigation firm.
23   Q.  All I'm asking you is whether or not you have any
24       other licenses, not whether you perform any work aside
25       from Progressive Security?
```

Page 10

1   A.  It's a company that I own.

2   Q.  Let me back you up for a second. I'm trying to

3       understand, we're talking about the license that the

4       State issues or the State Police or whatever bureau

5       that you're getting the license from, okay. So you

6       have a license as a security guard, correct?

7   A.  Correct.

8   Q.  And you have a license as a private investigator,

9       correct?

10  A.  Correct.

11  Q.  What is this other company that you've just mentioned?

12  A.  Another private security company.

13  Q.  So do you work for that company at the same time that

14      you work for Progressive Security?

15  A.  Yes.

16  Q.  How do you divide your time between the two?

17  A.  Not easy.

18  Q.  Do you work for both on the same day?

19  A.  Sometimes.

20  Q.  Do you bill hours to different entities on the same

21      day?

22  A.  Sometimes.

23  Q.  How do you go about allocating your hours with respect

24      to Progressive Security?

25  A.  Depends on the kind of work that we put out.

Page 11

1   Q.  Do you bill Progressive Security for your time and

2       they in turn bill the clients or do you bill clients

3       directly?

4   A.  Depends on the client.

5   Q.  With respect to the client in this case, Shady

6       Records, correct?

7           MR. DAVID:  Whoa.

8           MR. COHEN:  Objection.

9           MR. DAVID:  I direct you not to answer that

10      question.

11          MR. LANE:  On what basis, Mr. David?

12          MR. DAVID:  Because I believe it invokes

13      the investigative privilege under Michigan law.

14          MR. LANE:  And which particular Michigan

15      statute are you referring to, do you know?

16          MR. DAVID:  I don't, but —

17          MR. COHEN:  Yeah.

18          MR. DAVID:  I'll rely on them to tell me.

19          MR. COHEN:  There's a series of cases that

20      interpret MCL — give me a second, I'll give you the

21      cite, 338.840, which is also corresponding to Michigan

22      statutes annotated 18.184 (20).

23          MR. LANE:  And based on that statute, Mr.

24      David, I take it you're instructing him on behalf of

25      Shady not to respond to questions related to Shady's

Page 12

1   retention of Mr. Wier; is that correct?

2           MR. DAVID:  Or any work that he did for

3   Shady as a private investigator, that is correct, and

4   it's not only on that statute, it's based on that

5   statute in combination with case law interpreting that

6   statute.

7           MR. COHEN:  Yeah. Would you like the case

8   law?

9           MR. LANE:  I have the case law and I have

10  the statute.

11          MR. DAVID:  Well, I would appreciate it if

12  you'd put it in the record, if you don't mind.

13          MR. COHEN:  Sure. The case in Tazak,

14  T-A-Z-A-K versus Huntington Research Associates, which

15  is a 2001 Michigan appeals case; that's one of them.

16  Ravary, which is Ravary, R-A-V-A-R-Y, versus Reed, 163

17  Michigan appeals 447, 1987 case. Miller Oil versus

18  Smith Industries, 1990 decision of the United States

19  District Court for the Western District of Michigan,

20  Southern Division. Case called People versus Artis

21  White, which is 256 Michigan appeals 39, a 2003 case,

22  also interpreting the statute. Hang on one second, I

23  believe there's one more. By the way — well, that's

24  it.

25          MR. DAVID:  If I could, just so the record

Page 13

1   is clear, Tom, I believe you would agree that my

2   asserting this privilege does not come as a surprise

3   to you. This was communicated to Deb along with the

4   cases much earlier and I believe, in fact, that there

5   have been conversations between Mr. Wier's counsel and

6   Deb in that connection, although I was not a party to

7   those conversations.

8           MR. LANE:  I am not suggesting that —

9           MR. DAVID:  No, no, I'm not saying you are,

10  I just want to make it clear for the record.

11          MR. LANE:  Well, let me make a few things

12  clear for the record. I'm not suggesting it comes as

13  a surprise to me. I've looked at the case law,

14  particularly that Miller case, and I think there are a

15  number of exceptions to the privilege, including an

16  exception with respect to, except as may be required

17  by law, which I think exists here. I also think that

18  what I'm inquiring into are the facts and not

19  necessarily the substance of what Mr. Wier has done

20  and we know he's been retained by Shady, that's why

21  you're asserting the privilege. Otherwise you

22  couldn't assert the privilege. So it seems to be

23  focused a little bit on the bark on the trees, but

24  that is certainly something we can deal with Judge

25  Lynch with.